*705 Justice Kennedy
announced the judgment of the Court and delivered an opinion, in which The Chief Justice joins and Justice Alito joins in part.
In 1934, private citizens placed a Latin cross on a rock outcropping in a remote section of the Mojave Desert. Their purpose and intent was to honor American soldiers *706 who fell in World War I The original cross deteriorated over time, but a reconstructed one now stands at the same place. It is on federal land.
The Court is asked to consider a challenge, not to the first placement of the cross or its continued presence on federal land, but to a statute that would transfer the cross and the land on which it stands to a private party. Department of Defense Appropriations Act, 2004, Pub. L. 108-87, § 8121(a), 117 Stat. 1100. The District Court permanently enjoined the Government from implementing the statute. The Court of Appeals affirmed. We conclude that its judgment was in error.
I
A
The Mojave National Preserve (Preserve) spans approximately 1.6 million acres in southeastern California. The Preserve is nestled within the Mojave Desert, whose picturesque but rugged territory comprises 25,000 square miles, exceeding in size the combined area of the Nation’s five smallest States. See Merriam-Webster's Geographical Dictionary 755, 1228-1280 (3d ed. 1997). Just over 90 percent of the land in the Preserve is federally owned, with the rest owned either by the State of California or by private parties. The National Park Service, a division of the Department of the Interior, administers the Preserve as part of the National Park System. 16 U. S. C. §§410aaa-41 and 410aaa-46.
Sunrise Rock is a granite outcropping located within the Preserve. Sunrise Rock and the area in its immediate vicinity are federal land, but two private ranches are located less than two miles away. The record does not indicate whether fencing is used to mark the boundary of these ranches. In 1934, members of the Veterans of Foreign Wars (VFW) mounted a Latin cross on the rock as a memorial to soldiers who died in World War I. A Latin cross consists of two *707 bars — a vertical one and a shorter, horizontal one. The cross has been replaced or repaired at various times over the years, most recently in 1998 by Henry Sandoz. Sandoz is a private citizen who owns land elsewhere in the Preserve, a portion of which he is prepared to transfer to the Government in return for its conveyance to the VFW of the land on which the cross stands, all pursuant to the statute now under review.
The cross, as built by Sandoz, consists of 4-inch diameter metal pipes painted white. The vertical bar is less than eight feet tall. It cannot be seen from the nearest highway, which lies more than 10 miles away. It is visible, however, from Cima Road, a narrow stretch of blacktop that comes within 100 feet of Sunrise Rock.
The cross has been a gathering place for Easter services since it was first put in place; and Sunrise Rock and its immediate area continue to be used as a campsite. At one time the cross was accompanied by wooden signs stating “‘The Cross, Erected in Memory of the Dead of All Wars,’ and ‘Erected 1934 by Members of Veterans of Foregin [sic] Wars, Death Valley post 2884/ ” Buono v. Kempthorne, 527 F. 3d 758, 769 (CA9 2008). The signs have since disappeared, and the cross now stands unmarked.
B
Frank Buono, respondent here, is a retired Park Service employee who makes regular visits to the Preserve. Buono claims to be offended by the presence of a religious symbol on federal land. He filed suit in the United States District Court for the Central District of California. He alleged a violation of the Establishment Clause of the First Amendment and sought an injunction requiring the Government to remove the cross.
The litigation proceeded in what can be described as four stages. In the first, the District Court ruled in Buono’s favor on opposing motions for summary judgment. Buono *708 v. Norton, 212 F. Supp. 2d 1202 (2002) (Buono I). As an initial matter, the court found that Buono had standing to maintain his Establishment Clause challenge. Id., at 1210-1214. On the merits, the parties agreed that the dispute should be governed by the so-called Lemon test, which the District Court formulated as follows:
“A government religious practice or symbol will survive an Establishment Clause challenge when it (1) has a secular purpose, (2) has a primary effect that neither advances nor inhibits religion, and (3) does not foster excessive state entanglement with religion.” Buono I, supra, at 1214-1215 (citing Lemon v. Kurtzman, 403 U. S. 602, 612-613 (1971)).
The court expressly declined to consider whether the Government’s actions regarding the cross had a secular purpose, 212 F. Supp. 2d, at 1214-1215, or whether they caused excessive entanglement with religion, id., at 1217, n. 9. Instead, the court evaluated the primary effect of the cross by asking how it would be viewed by a “reasonable observer.” Id., at 1216. Concluding that presence of the cross on federal land conveyed an impression of governmental endorsement of religion, the court granted Buono’s request for injunctive relief. The court’s order in Buono I (2002 injunction) permanently forbade the Government “from permitting the display of the Latin cross in the area of Sunrise Rock in the Mojave National Preserve.” App. to Pet. for Cert. 146a.
The United States Court of Appeals for the Ninth Circuit stayed the 2002 injunction to the extent that it required the cross to be removed or dismantled but did not forbid alternative methods of complying with the order. The Government covered the cross, first with a tarpaulin and later with a plywood box.
On appeal, the judgment of the District Court was affirmed, both as to standing and on the merits of Buono’s Establishment Clause challenge. Buono v. Norton, 371 F. 3d *709 543 (CA9 2004) (Buono II). Like the District Court, the Court of Appeals did not decide whether the Government’s action, or nonaction, with respect to the cross had been motivated by a secular purpose. Id., at 550. Its ruling was based instead on the conclusion that a reasonable observer would perceive a cross on federal land as governmental endorsement of religion. Id., at 549-550. The Government did not seek review by this Court, so that the judgment of the Court of Appeals in Buono II became final.
C
During the relevant proceedings, Congress enacted certain statutes related to the cross:
(1) Before Buono I was filed, Congress passed an appropriations bill that included a provision forbidding the use of governmental funds to remove the cross. Consolidated Appropriations Act, 2001, Pub. L. 106-554, §133, 114 Stat. 2763A-230.
(2) While Buono I was pending before the District Court, Congress designated the cross and its adjoining land “as a national memorial commemorating United States participation in World War I and honoring the American veterans of that war.” Department of Defense Appropriations Act, 2002, Pub. L. 107-117, § 8137(a), 115 Stat. 2278. The Secretary of the Interior was directed to expend up to $10,000 to acquire a replica of the original cross and its memorial plaque and to install the plaque at a suitable nearby location. § 8137(c).
(3) Three months after Buono I was decided, Congress again prohibited the spending of governmental funds to remove the cross. Department of Defense Appropriations Act, 2003, Pub. L. 107-248, § 8065(b), 116 Stat. 1551.
(4) While the Government’s appeal in Buono II was pending, Congress passed a statute (land-transfer statute) directing the Secretary of the Interior to transfer to the VFW the Government’s interest in the land that had been designated a *710 national memorial. Department of Defense Appropriations Act, 2004, § 8121(a), 117 Stat. 1100. In exchange, the Government was to receive land elsewhere in the preserve from Henry Sandoz and his wife. Ibid. Any difference in value between the two parcels would be equalized through a cash payment. §§ 8121(c), (d). The land-transfer statute provided that the property would revert to the Government if not maintained “as a memorial commemorating United States participation in World War I and honoring the American veterans of that war.” § 8121(e). The statute presents a central issue in this case.
The Court of Appeals in Buono II did not address the effect on the suit of a potential land transfer under the statute. The court noted that the transfer might “take as long as two years to complete,” 371 F. 3d, at 545, and that its effect was not yet known, id., at 545-546. The court thus “expressed] no view as to whether a transfer completed under [the statute] would pass constitutional muster.” Id., at 546.
D
After the Court of Appeals affirmed in Buono II, Buono returned to the District Court seeking to prevent the land transfer. He sought injunctive relief against the transfer, either through enforcement or modification of the 2002 injunction. In evaluating his request the trial court described the relevant question as whether the land transfer was a bona fide attempt to comply with the injunction (as the Government claimed), or a sham aimed at keeping the cross in place (as Buono claimed). Buono v. Norton, 364 F. Supp. 2d 1175, 1178 (CD Cal. 2005) (Buono III). In Buono III, the court did not consider whether the transfer itself was an “independent violation of the Establishment Clause.” Id., at 1182, n. 8. The court nevertheless concluded that the transfer was an attempt by the Government to keep the cross atop Sunrise Rock and so was invalid. The court granted Buono’s motion to enforce the 2002 injunction; denied as *711 moot his motion to amend it; and permanently enjoined the Government from implementing the land-transfer statute. Id., at 1182.
The Court of Appeals again affirmed, largely following the reasoning of the District Court. Buono v. Kempthome, 502 F. 3d 1069 (CA9 2007). The Government’s motion for rehearing en banc was denied over a dissent by Judge O’Scannlain, 527 F. 3d 758, and this Court granted certiorari, 555 U. S. 1169 (2009).
II
Before considering the District Court’s order on the merits, the first inquiry must be with respect to Buono’s standing to maintain this action. To demonstrate standing, a plaintiff must have “alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.” Horne v. Flores, 557 U. S. 433, 445 (2009) (internal quotation marks omitted). The Government argues that Buono’s asserted injury is not personal to him and so does not confer Article III standing. As noted above, Buono does not find the cross itself objectionable but instead takes offense at the presence of a religious symbol on federal land. Buono does not claim that, as a personal matter, he has been made to feel excluded or coerced, and so, the Government contends, he cannot object to the presence of the cross. Brief for Petitioners 12-17.
Whatever the validity of the objection to Buono’s standing, that argument is not available to the Government at this stage of the litigation. When Buono moved the District Court in Buono I for an injunction requiring the removal of the cross, the Government raised the same standing objections it proffers now. Rejecting the Government’s position, the District Court entered a judgment in Buono’s favor, which the Court of Appeals affirmed in Buono II. The Government did not seek review in this Court. The judgment became final and unreviewable upon the expiration of the 90-day deadline under 28 U. S. C. § 2101(c) for filing a petition *712 for certiorari. Toledo Scale Co. v. Computing Scale Co., 261 U. S. 399, 418 (1923); see Missouri v. Jenkins, 495 U. S. 33, 45 (1990) (90-day deadline is “mandatory and jurisdictional”). The Government cannot now contest Buono’s standing to obtain the final judgment in Buono I.
Of course, even though the Court may not reconsider whether Buono had standing to seek the 2002 injunction, it is still necessary to evaluate his standing in Buono III to seek application of the injunction against the land-transfer statute. That measure of relief is embodied in the judgment upon which we granted review.
This was a measure of relief that Buono had standing to seek. A party that obtains a judgment in its favor acquires a “judicially cognizable” interest in ensuring compliance with that judgment. See Allen v. Wright, 468 U. S. 737, 763 (1984) (plaintiffs’ right to enforce a desegregation decree to which they were parties is “a personal interest, created by law, in having the State refrain from taking specific actions”). Having obtained a final judgment granting relief on his claims, Buono had standing to seek its vindication.
The Government does not deny this proposition as a general matter. Instead, it argues that Buono was not seeking to vindicate — but rather to extend — the 2002 injunction. The first injunction prohibited the Government from maintaining the cross on Sunrise Rock; yet in Buono III he sought to preclude the land transfer, a different governmental action. The Government contends that Buono lacked standing to seek this additional relief. Reply Brief for Petitioners 5.
The Government’s argument, however, is properly addressed to the relief granted by the judgment below, not to Buono’s standing to seek that relief. The Government has challenged whether appropriate relief was granted in Buono III in light of the relevant considerations and legal principles, and we shall consider these questions. The standing inquiry, by contrast, turns on the alleged injury that *713 prompted the plaintiff to invoke the court’s jurisdiction in the first place. Buono’s entitlement to an injunction having been established in Buono I and II, he sought in Buono III to prevent the Government from frustrating or evading that injunction. Based on the rights he obtained under the earlier decree — against the same party, regarding the same cross and the same land — his interests in doing so were sufficiently personal and concrete to support his standing. Although Buono also argued that the land transfer should be prohibited as an “independent” Establishment Clause violation, the District Court did not address or order relief on that claim, which is not before us. Buono III, 364 F. Supp. 2d, at 1182, n. 8. This is not a case in which a party seeks to import a previous standing determination into a wholly different dispute.
In arguing that Buono sought to extend, rather than to enforce, the 2002 injunction, the Government in essence contends that the injunction did not provide a basis for the District Court to invalidate the land transfer. This is not an argument about standing but about the merits of the District Court’s order. Those points now must be addressed.
Ill
The procedural history of this litigation must be considered to identify the issues now subject to review. The District Court granted the 2002 injunction after concluding that a cross on federal land violated the Establishment Clause. The Government unsuccessfully challenged that conclusion on appeal, and the judgment became final upon completion of direct review. At that point, the judgment “became res judicata to the parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.” Travelers Indemnity Co. v. Bailey, 557 U. S. 137, 152 (2009) (internal quotation marks omitted). The Govern *714 ment therefore does not — and could not — ask this Court to reconsider the propriety of the 2002 injunction or the District Court’s reasons for granting it.
The question now before the Court is whether the District Court properly enjoined the Government from implementing the land-transfer statute. The District Court did not consider whether the statute, in isolation, would have violated the Establishment Clause, and it did not forbid the land transfer as an independent constitutional violation. Buono III, supra, at 1182, n. 8. Rather, the court enjoined compliance with the statute on the premise that the relief was necessary to protect the rights Buono had secured through the 2002 injunction.
An injunction is an exercise of a court’s equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief. See United States v. Swift & Co., 286 U. S. 106, 114 (1932). See also Weinberger v. Romero-Barcelo, 456 U. S. 305, 312 (1982); Hecht Co. v. Bowles, 321 U. S. 321, 329 (1944); 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2942, pp. 39-42 (2d ed. 1995) (hereinafter Wright & Miller). Equitable relief is not granted as a matter of course, see Weinberger, 456 U. S., at 311-312, and a court should be particularly cautious when contemplating relief that implicates public interests, see id., at 312 (“In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction”); Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U. S. 334, 338 (1933) (“Where an important public interest would be prejudiced, the reasons for denying the injunction may be compelling”). Because injunctive relief “is drafted in light of what the court believes will be the future course of events,... a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an ‘instrument of *715 wrong.’” Wright & Miller §2961, at 393-394 (quoting Swift & Co., supra, at 115).
Here, the District Court did not engage in the appropriate inquiry. The land-transfer statute was a substantial change in circumstances bearing on the propriety of the requested relief. The court, however, did not acknowledge the statute’s significance. It examined the events that led to the statute’s enactment and found an intent to prevent removal of the cross. Deeming this intent illegitimate, the court concluded that nothing of moment had changed. This was error. Even assuming that the land-transfer statute was an attempt to prevent removal of the cross, it does not follow that an injunction against its implementation was appropriate.
By dismissing Congress’ motives as illicit, the District Court took insufficient account of the context in which the statute was enacted and the reasons for its passage. Private citizens put the cross on Sunrise Rock to commemorate American servicemen who had died in World War I. Although certainly a Christian symbol, the cross was not em-placed on Sunrise Rock to promote a Christian message. Cf. County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U. S. 573, 661 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part) (“[T]he [Establishment] Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall. .. because such an obtrusive year-round religious display would place the government’s weight behind an obvious effort to proselytize on behalf of a particular religion”). Placement of the cross on Government-owned land was not an attempt to set the imprimatur of the state on a particular creed. Rather, those who erected the cross intended simply to honor our Nation’s fallen soldiers. See Brief for VFW et al. as Amici Curiae 15 (noting that the plaque accompanying the cross “was decorated with VFW decals”).
*716 Time also has played its role. The cross had stood on Sunrise Rock for nearly seven decades before the statute was enacted. By then, the cross and the cause it commemorated had become entwined in the public consciousness. See ibid. Members of the public gathered regularly at Sunrise Rock to pay their respects. Rather than let the cross deteriorate, community members repeatedly took it upon themselves to replace it. Congress ultimately designated the cross as a national memorial, ranking it among those monuments honoring the noble sacrifices that constitute our national heritage. See note following 16 U. S. C. § 481 (listing officially designated national memorials, including the National D-Day Memorial and the Vietnam Veterans Memorial). Research discloses no other national memorial honoring American soldiers — more than 300,000 of them — who were killed or wounded in World War I. See generally A. Leland & M. Oboroceanu, Congressional Research Service Report for Congress, American War and Military Operations Casualties: Lists and Statistics 2 (2009). It is reasonable to interpret the congressional designation as giving recognition to the historical meaning that the cross had attained. Cf. Van Orden v. Perry, 545 U. S. 677, 702-703 (2005) (Breyer, J., concurring in judgment) (“40 years” without legal challenge to a Ten Commandments display “suggest that the public visiting the [surrounding] grounds has considered the religious aspect of the tablets’ message as part of what is a broader moral and historical message reflective of a cultural heritage”).
The 2002 injunction thus presented the Government with a dilemma. It could not maintain the cross without violating the injunction, but it could not remove the cross without conveying disrespect for those the cross was seen as honoring. Cf. id., at 704 (to invalidate a longstanding Ten Commandments display might “create the very kind of religiously based divisiveness that the Establishment Clause *717 seeks to avoid”). Deeming neither alternative to be satisfactory, Congress enacted the statute here at issue. Congress, of course, may not use its legislative powers to reopen final judgments. See Plant v. Spendthrift Farm, Inc., 514 U. S. 211, 225-226 (1995). That principle, however, was not a bar to this statute. The Government’s right to transfer the land was not adjudicated in Buono I or compromised by the 2002 injunction.
In belittling the Government’s efforts as an attempt to “evade” the injunction, Buono III, 364 F. Supp. 2d, at 1182, the District Court had things backwards. Congress’ prerogative to balance opposing interests and its institutional competence to do so provide one of the principal reasons for deference to its policy determinations. See Patsy v. Board of Regents of Fla., 457 U. S. 496, 513 (1982). Here, Congress adopted a policy with respect to land it now owns in order to resolve a specific controversy. Congress, the Executive, and the Judiciary all have a duty to support and defend the Constitution. See United States v. Nixon, 418 U. S. 683, 703 (1974) (“In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others”). The land-transfer statute embodies Congress’ legislative judgment that this dispute is best resolved through a framework and policy of accommodation for a symbol that, while challenged under the Establishment Clause, has complex meaning beyond the expression of religious views. That judgment should not have been dismissed as an evasion, for the statute brought about a change of law and a congressional statement of policy applicable to the case.
Buono maintains that any governmental interest in keeping the cross up must cede to the constitutional concerns on which the 2002 injunction was based. He argues that the land transfer would be “an incomplete remedy” to the consti *718 tutional violation underlying the injunction and that the transfer would make achieving a proper remedy more difficult. Brief for Respondent 54.
A court must find prospective relief that fits the remedy to the wrong or injury that has been established. See Swift & Co., 286 U. S., at 114 (“A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need”). See also United States v. United Shoe Machinery Corp., 391 U. S. 244, 249 (1968). Where legislative action has undermined the basis upon which relief has previously been granted, a court must consider whether the original finding of wrongdoing continues to justify the court’s intervention. See Railway Employees v. Wright, 364 U. S. 642, 648-649 (1961); Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. 421, 430-432 (1856). The relevant question is whether an ongoing exercise of the court’s equitable authority is supported by the prior showing of illegality, judged against the claim that changed circumstances have rendered prospective relief inappropriate.
The District Court granted the 2002 injunction based solely on its conclusion that presence of the cross on federal land conveyed an impression of governmental endorsement of religion. The court expressly disavowed any inquiry into whether the Government’s actions had a secular purpose or caused excessive entanglement. Buono I, 212 F. Supp. 2d, at 1215, 1217, n. 9. The Court of Appeals affirmed the injunction on the same grounds, similarly eschewing any scrutiny of governmental purpose. Buono II, 371 F. 3d, at 550.
Although, for purposes of the opinion, the propriety of the 2002 injunction may be assumed, the following discussion should not be read to suggest this Court’s agreement with that judgment, some aspects of which may be questionable. The goal of avoiding governmental endorsement does not require eradication of all religious symbols in the public realm. A cross by the side of a public highway marking, for instance, *719 the place where a state trooper perished need not be taken as a statement of governmental support for sectarian beliefs. The Constitution does not oblige government to avoid any public acknowledgment of religion’s role in society. See Lee v. Weisman, 505 U. S. 577, 598 (1992) (“A relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution”). See also Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U. S. 327, 334 (1987) (“This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause” (internal quotation marks omitted)). Rather, it leaves room to accommodate divergent values within a constitutionally permissible framework.
Even assuming the propriety of the original relief, however, the question before the District Court in Buono III was whether to invalidate the land transfer. Given the sole reliance on perception as a basis for the 2002 injunction, one would expeet that any relief grounded on that decree would have rested on the same basis. But the District Court enjoined the land transfer on an entirely different basis: its suspicion of an illicit governmental purpose. See Buono III, 364 F. Supp. 2d, at 1182. The court made no inquiry into the effect that knowledge of the transfer of the land to private ownership would have had on any perceived governmental endorsement of religion, the harm to which the 2002 injunction was addressed. The District Court thus used an injunction granted for one reason as the basis for enjoining conduct that was alleged to be objectionable for a different reason. Ordering relief under such circumstances was improper — absent a finding that the relief was necessary to address an independent wrong. See ibid., n. 8 (noting that the court “need not consider [Buono’s] other contention that the land transfer itself is an independent violation of the Establishment Clause”).
*720 The District Court should have evaluated Buono’s modification request in light of the objectives of the 2002 injunction. The injunction was issued to address the impression conveyed by the cross on federal, not private, land. Even if its purpose were characterized more generally as avoiding the perception of governmental endorsement, that purpose would favor — or at least not oppose — ownership of the cross by a private party rather than by the Government. Cf. Pleasant Grove City v. Summum, 555 U. S. 460, 471 (2009) (“[Pjersons who observe donated monuments routinely — and reasonably — interpret them as conveying some message on the property owner’s behalf”).
Buono argues that the cross would continue to stand on Sunrise Rock, which has no visual differentiation from the rest of the primarily federally owned Preserve. He also points to the reversionary clause in the land-transfer statute requiring that the land be returned to the Government if not maintained as a World War I memorial. Finally, he notes that the cross remains designated a national memorial by an Act of Congress, which arguably would prevent the VFW from dismantling the cross even if it wanted to do so. Brief for Respondent 37-48.
The District Court failed to consider whether, in light of the change in law and circumstances effected by the land-transfer statute, the “reasonable observer” standard continued to be the appropriate framework through which to consider the Establishment Clause concerns invoked to justify the requested relief As a general matter, courts considering Establishment Clause challenges do not inquire into “reasonable observer” perceptions with respect to objects on private land. Even if, however, this standard were the appropriate one, but see County of Allegheny, 492 U. S., at 668 (Kennedy, J., concurring in judgment in part and dissenting in part) (criticizing the “reasonable observer” test); Capitol Square Review and Advisory Bd. v. Pinette, 515 U. S. *721 753, 763-768 (1995) (plurality opinion) (criticizing reliance on “perceived endorsement”), it is not clear that Buono’s claim is meritorious. That test requires the hypothetical construct of an objective observer who knows all of the pertinent facts and circumstances surrounding the symbol and its placement. See id., at 780 (O’Connor, J., concurring in part and concurring in judgment). But see id., at 767-768 (plurality opinion) (doubting the workability of the reasonable observer test). Applying this test here, the message conveyed by the cross would be assessed in the context of all relevant factors. See Van Orden, 545 U. S., at 700 (Breyer, J., concurring in judgment) (the Establishment Clause inquiry “must take account of context and consequences”); Lee, 505 U. S. at 597 (“Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one”).
The District Court did not attempt to reassess the findings in Buono I in light of the policy of accommodation that Congress had embraced. Rather, the District Court concentrated solely on the religious aspects of the cross, divorced from its background and context. But a Latin cross is not merely a reaffirmation of Christian beliefs. It is a symbol often used to honor and respect those whose heroic acts, noble contributions, and patient striving help secure an honored place in history for this Nation and its people. Here, one Latin cross in the desert evokes far more than religion. It evokes thousands of small crosses in foreign fields marking the graves of Americans who fell in battles, battles whose tragedies are compounded if the fallen are forgotten.
Respect for a coordinate branch of Government forbids striking down an Act of Congress except upon a clear showing of unconstitutionality. See United States v. Morrison, 529 U. S. 598, 607 (2000); El Paso & Northeastern R. Co. v. Gutierrez, 215 U. S. 87, 96 (1909). The same respect requires that a congressional command be given effect unless no legal alternative exists. Even if, contrary to the congres *722 sional judgment, the land transfer were thought an insufficient accommodation in light of the earlier finding of religious endorsement, it was incumbent upon the District Court to consider less drastic relief than complete invalidation of the land-transfer statute. See Ayotte v. Planned Parenthood of Northern New Eng., 546 U. S. 320, 329 (2006) (in granting relief, “we try not to nullify more of a legislature’s work than is necessary, for we know that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people” (internal quotation marks omitted; alteration in original)); Alaska Airlines, Inc. v. Brock, 480 U. S. 678, 684 (1987). For instance, if there is to be a conveyance, the question might arise regarding the necessity of further action, such as signs to indicate the VFW’s ownership of the land. As we have noted, Congress directed the Secretary of the Interior to install near the cross a replica of its original memorial plaque. One of the signs that appears in early photographs of the cross specifically identifies the VFW as the group that erected it.
Noting the possibility of specific remedies, however, is not an indication of agreement about the continued necessity for injunctive relief. The land-transfer statute’s bearing on this dispute must first be determined. To date, this Court’s jurisprudence in this area has refrained from making sweeping pronouncements, and this case is ill suited for announcing categorical rules. In light of the finding of unconstitutionality in Buono I, and the highly fact-specific nature of the inquiry, it is best left to the District Court to undertake the analysis in the first instance. On remand, if Buono continues to challenge implementation of the statute, the District Court should conduct a proper inquiry as described above.
* * *
The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings.

It is so ordered.