**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVE TRUNK,

*Plaintiff,*

and

JEWISH WAR VETERANS OF THE
UNITED STATES OF AMERICA, INC.;
RICHARD A. SMITH; MINA SAGHEB;
JUDITH M. COPELAND,

*Plaintiffs-Appellants,*

v.

CITY OF SAN DIEGO; UNITED STATES
OF AMERICA; ROBERT M. GATES,
Secretary of Defense,

*Defendants-Appellees.*

No. 08-56415

D.C. Nos.
3:06-cv-01597-
LAB-WMC
3:06-cv-01728-
LAB-WMC
Southern District of
California,
San Diego

18969

Steve Trunk, Philip K. Paulson,
          *Plaintiffs-Appellants,*

          and

Richard A. Smith; Mina Sagheb;
Judith M. Copeland; Jewish War
Veterans of the United States of
America, Inc.,

                    *Plaintiffs,*

          v.

City of San Diego; United States
of America; Mount Soledad
Memorial Association, Real
parties in interest; Robert M.
Gates, Secretary of Defense, in
his official capacity,
          *Defendants-Appellees,*

No. 08-56436

D.C. Nos.
3:06-cv-01597-
LAB-WMC
3:06-cv-01728-
LAB-WMC
Southern District of
California,
San Diego

ORDER

Filed October 14, 2011

Before: Harry Pregerson, M. Margaret McKeown, and
Richard A. Paez, Circuit Judges.

Order;
Dissent by Judge Bea

**ORDER**

A majority of the panel has voted to deny the petitions for rehearing. A judge of the court called for a vote on the petitions for rehearing en banc. A vote was taken, and a majority of the active judges of the court failed to vote for en banc rehearing. Fed. R. App. P. 35(f). The petitions for rehearing and for rehearing en banc are DENIED.

BEA, Circuit Judge, dissenting from the denial of rehearing en banc, joined by O'SCANNLAIN, TALLMAN, CALLAHAN, and IKUTA, Circuit Judges:

"A rose is a rose is a rose."

— Gertrude Stein, *Sacred Emily*, 1913.

Stein wrote this sentiment to express the flower's indescribable, unchangeable essence. The panel appears to have transmogrified Stein's ode to a rose into a new rule of law—"a cross is a cross is a cross." Alas, that is neither good poetry nor valid law. Unlike roses, religious symbols can have multiple meanings, just as the Ten Commandments monument did in *Van Orden*:

> Of course, the Ten Commandments are religious— they were so viewed at their inception and so remain. The monument, therefore, has religious significance. According to Judeo-Christian belief, the Ten Commandments were given to Moses by God on Mt. Sinai. But Moses was a lawgiver as well as a religious leader. And the Ten Commandments have an undeniable historical meaning, as the foregoing examples demonstrate. Simply having a religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause.

*Van Orden v. Perry*, 545 U.S. 677, 690 (2005); *see also McCreary County v. ACLU*, 545 U.S. 844, 867-68 (2005).

*Van Orden* tells us that the proper test to determine whether the government has violated the Establishment Clause by erecting or maintaining a religious symbol on public grounds depends on: (1) the government's use of the religious symbol; (2) the context in which that symbol appears; and (3) the history of the symbol while under government control, including

how long it has stood unchallenged.[1] *See McCreary County*, 545 U.S. at 867-68 (2005); *Van Orden*, 545 U.S. at 681.

As to use, it is undisputed here that from the moment the federal government took title to the Mt. Soledad Memorial site in 2006, it has neither held nor permitted to be held any sort of a religious exercise there. The site has been used solely for the purpose of memorializing fallen soldiers, consistent with the Cross's "undeniable historical meaning," *Van Orden* at 690, evoking the memory of fallen soldiers.

As to context, the record evidence is also undisputed that at the time the federal government bought the Mt. Soledad Memorial site, the Cross was surrounded with over 2,100 plaques commemorating veterans of various faiths or of no faith, and 23 bollards[2] commemorating some particularly val-

---

[1]Additionally, just what is the new test the panel invented: the test for "borderline" cases? *See Jewish War Veterans v. City of San Diego*, 629 F.3d 1099, 1108 (9th Cir. 2011). The panel opinion concludes that whether we use *Lemon* or *Van Orden* depends on whether a case is "borderline." First, the panel fails to tell us how to determine whether a case is borderline. Is a case borderline when judges can disagree? When it comes to Establishment Clause cases involving religious symbols, I have yet to see one on which all judges agree. This cannot be the desiderata in these cases. Rather, which test we apply must be determined by which test logically fits the type of case, whether it be a publicly-displayed symbol like the Ten Commandments in *Van Orden*, or a governmental practice, such as opening Congressional sessions with a prayer. *See Marsh v. Chambers*, 463 U.S. 783 (1983). To allow judges to pick which of the Establishment Clause tests they apply according to whether they think it is a "borderline" case or not—without defining what is "borderline"—is a recipe for uncertainty in our law.

[2]A bollard is a symbolic representation of a nautical feature commonly described as a post fixed to a quay or a vessel for securing mooring ropes. The bollards have been dedicated to, for example, the American Legion and the VFW Post Mission Bay. Some of the group plaques have been dedicated to military ships, including the USS Hanson, used in World War II, Korea and Vietnam, and brigades and platoons, including "Echo Company," which proudly calls itself "The Magnificent Bastards." For further information and examples, see http://www.soledadmemorial.com/web/pages/view_example_plaques/group_war_plaques.htm.

iant units who had taken casualties and various secular community groups.

As to history, it is again undisputed that the history of the Mt. Soledad Cross has changed as its use has changed.

For the same reason that the Ten Commandments stand today in that park in Austin, Texas, the Cross should continue to stand on Mt. Soledad: a religious symbol is not always used to promote religion. Whether it promotes religion depends on the context in which the symbol is displayed, how it is used, and its history. Here, that display, use, and history are secular and require affirmance of summary judgment for the federal government.

Second, were the panel to eschew the *Van Orden* rule, for a test as to whether a reasonable observer, aware of all relevant circumstances, would believe the Cross constituted a government endorsement of religion, it erred by failing to recognize a triable issue of material fact: that there was conflicting evidence in the record as to whether that reasonable observer would necessarily conclude the federal government was trying to endorse religion by maintaining the Mt. Soledad Memorial Park, including the Cross at its entrance.

## I.   The panel applied the wrong test.

Establishment Clause jurisprudence does not have a nice, neat, one-test-fits-all pattern. Which test the Supreme Court applies varies depending on what fact pattern is involved. When it comes to religious symbols in the public square, the Court questions the applicability of the *Lemon* test:[3]

---

[3]Under the *Lemon* test, to be constitutional (1) the challenged governmental action must have a secular purpose; (2) "its principal or primary effect must be one that neither advances nor inhibits religion"; and (3) it "must not foster an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).

> Whatever may be the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence, we think it not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds. Instead, our analysis is driven both by the nature of the monument and by our Nation's history.

*Van Orden*, 545 U.S. at 686 (plurality op.). Notice too that the Court in *Van Orden* also did not choose to use the Endorsement Test from *County of Allegheny v. ACLU,* 492 U.S. 573, 578-79 (1989), to test the Ten Commandments monuments.

It is precisely because the federal government has eliminated any religious exercises at the Mt. Soledad memorial site that *Van Orden* applies. Although the Supreme Court did not state the factors to consider when evaluating a religious symbol on government land in one concise sentence,[4] reading the entire *Van Orden* opinion it is clear the Court looked at three elements to determine whether the government has violated the Establishment Clause by erecting or maintaining a monument that has religious significance.

First, the Court looked at the government's *use* of the religious symbol:

> On the one hand, the Commandments' text unquestionably has a religious message, invoking, indeed emphasizing, the Deity. On the other hand, focusing on the text of the Commandments alone cannot conclusively resolve this case. Rather, to determine the message that the text here conveys, we must examine how the text is *used.* And that inquiry requires us to consider the context of the display.

---

[4]Indeed, the Court specified that "[n]o exact formula can dictate a resolution to fact-intensive cases such as this." *Van Orden*, 545 U.S. at 690. This is true, but I see no reason why the test applied in *McCreary County* and *Van Orden* would not also be the applicable test here.

*Van Orden*, 545 U.S. at 700-01 (Breyer, J., concurring) (emphasis in original). On this factor, it is undisputed that the *use* of the Mt. Soledad Cross by the federal government sought to be enjoined has been exclusively secular.

Second, the Court looked at the *context* in which the symbol appears:

> Despite the Commandments' religious message, an inquiry into the context in which the text of the Commandments is used demonstrates that the Commandments also convey a secular moral message about proper standards of social conduct and a message about the historic relation between those standards and the law. The circumstances surrounding the monument's placement on the capitol grounds and its physical setting provide a strong, but not conclusive, indication that the Commandments' text as used on this monument conveys a predominantly secular message.

*Van Orden*, 545 U.S. at 691. On this factor, only plaques commemorating veterans and bollards commemorating secular groups have been placed around the Cross at Mt. Soledad. The Cross stands at the entrance to the memorial, next to a giant American flag, making it clear the site marks the entrance to a veterans' memorial.

None of the groups listed on either the bollards or group plaques are religious groups.

Third, the Court examined the history of the symbol while under government control, including how long it has stood unchallenged. *Van Orden*, 545 U.S. at 686-91 and *passim. See also McCreary County*, 545 U.S. at 867-68. There had been no court challenge to the Cross from 1913 until 1989, roughly 76 years.

## II.    The Government's use of the Mt. Soledad Memorial and the context in which the Cross appears are both secular.

Both *McCreary County* and *Van Orden* involved a monument with unquestionably Judeo-Christian religious text—the Ten Commandments. But the Court's analysis did not stop there. "[T]he question is what viewers may fairly understand to be the purpose of the display. That inquiry, of necessity, turns upon the context in which the contested object appears." *McCreary County*, 545 U.S. at 867-68 (citation omitted). In *McCreary County*, the Ten Commandments were displayed alone in the entrance to the Kentucky courthouse; they were being used as a symbol of God's teaching and a set of rules that all should live by. Thus, the setting in Kentucky conveyed a message along the lines of, "Thou shalt follow these Judeo-Christian laws or be in violation of the laws that are enforced in this courthouse." By contrast, in Texas, that same text was displayed on one of many monuments, all of which had some historical significance. Thus, the message in Texas was more along the lines of, "Here is a text that has helped to shape our state's history and laws." The text in both cases was the same, but the setting made all the difference.

Here, we have a Cross, an unquestionably Christian symbol. In a previous case, this court held that due to its strong religious connotations, a Cross standing alone on federal land in the Mojave National Preserve—even a Cross erected as a memorial to fallen soldiers—violated the Establishment Clause. *Buono v. Norton*, 371 F.3d 543 (9th Cir. 2004).

But *Buono v. Norton* does not determine this case, for two reasons. First, it was handed down a year *before* the Ten Commandment cases, and understandably did not discuss either.

Second, in its next iteration, *Salazar v. Buono*, ___ U.S. ___, 130 S. Ct. 1803 (2010), the Court did not hold the lone

Cross to be such an inherently religious symbol that it violated the Establishment Clause. If the Cross were ineluctably only a religious symbol, there would have been no need for the Court's remand in *Buono* to the district court for it to consider whether the transfer of the land on which the Cross sat to a private party from the federal government was significant for the purposes of determining whether an Establishment Clause violation had occurred.

Writing for himself, Chief Justice Roberts and Justice Alito, Justice Kennedy[5] recognized the unique history of the Cross as a symbol of respect for fallen soldiers (of all faiths or no faith) and criticized the district court for conducting the very same analysis the panel employs in this case:

> [T]he District Court concentrated solely on the religious aspects of the cross, divorced from its background and context. But a Latin cross is not merely a reaffirmation of Christian beliefs. It is a symbol often used to honor and respect those whose heroic acts, noble contributions, and patient striving help secure an honored place in history for this Nation and its people. Here, one Latin cross in the desert evokes far more than religion. It evokes thousands of small crosses in foreign fields marking the graves of Americans who fell in battles, battles whose tragedies are compounded if the fallen are forgotten.

*Buono*, 130 S. Ct. at 1820. In his concurrence, Justice Alito also recognized that crosses have a secular significance, particularly in the military realm, and thus they do not need to be removed from the public domain simply because they are also the symbol of Christianity:

---

[5]Justices Scalia and Thomas wrote a separate concurrence in *Salazar v. Buono* that in their opinion the plaintiff did not have standing to bring this challenge. *See* 130 S. Ct. at 1824. They did, however, join in the judgment in *Van Orden. See* 545 U.S. 647.

> [T]he original reason for the placement of the cross was to commemorate American war dead and, particularly for those with searing memories of The Great War, the symbol that was selected, a plain unadorned white cross, no doubt evoked the unforgettable image of the white crosses, row on row, that marked the final resting places of so many American soldiers who fell in that conflict. . . . The demolition of this venerable if unsophisticated, monument would also have been interpreted by some as an arresting symbol of a Government that is not neutral but hostile on matters of religion and is bent on eliminating from all public places and symbols any trace of our country's religious heritage.

*Id.* at 1823 (Alito, J., concurring).

If the Mojave Desert cross standing by itself, with only a single plaque, can be understood as a memorial to fallen soldiers, then surely the Mt. Soledad Cross, surrounded by more than 2100 memorial plaques, bollards commemorating groups of veterans, and a gigantic American flag, can be viewed as a memorial as well.

### III.    History can change the use of a symbol and its meaning.

History is important, in part because things change over time. The Spanish government of the day endorsed the Inquisition until the early years of the 19th Century. Would a reasonable observer therefore consider the edicts of King Ferdinand VII in determining whether today's Socialist government endorses the Inquisition? Of course not.

The panel concentrated its analysis on the history of the Cross as a religious symbol. Not on how *this* Cross at Mt. Soledad has been used by *this* government, but on the cross in general. Were the panel's analysis the correct one to deter-

mine whether the challenged symbol is religious in nature, then many a Supreme Court case would have come out differently. Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause. *See, e.g., Lynch v. Donnelly*, 465 U.S. 668, 687 (1984). In *Lynch*, the Court upheld a Christmas display that included a Nativity crèche, another unquestionably Christian symbol:

> To forbid the use of this one passive symbol—the crèche—at the very time people are taking note of the season with Christmas hymns and carols in public schools and other public places, and while the Congress and Legislatures open sessions with prayers by paid chaplains would be a stilted *overreaction* contrary to our history and to our holdings. If the presence of the crèche in this display violates the Establishment Clause, a host of other forms of taking official note of Christmas, and of our religious heritage, are equally offensive to the Constitution.

465 U.S. at 686 (emphasis added). Here too, removing the Cross, which has stood on Mt. Soledad since 1913, would be an over-reaction. Similarly, in *McGowan v. Maryland*, the Court upheld laws that originated from one of the Ten Commandments: a prohibition of sales of merchandise on Sunday. 366 U.S. 420, 431-40 (1961). Each of these cases involved something that was religious in nature. But none violated the Establishment Clause. Why? Because the context in which they existed and the relevant history made it clear that they had not only a religious element to them, but they also served a secular purpose.

The principal defect of the panel's decision is its concentration on facts which occurred between 1913 and 2006. The City of San Diego is no longer the owner of the property. The federal government now owns the property. Thus, the use to

which the City of San Diego put the Mt. Soledad Cross from 1954 to 2006, just as the use to which the private group put the Cross from 1913 to 1954,[6] is not relevant as to whether the *present* use by the government—the precise use which plaintiffs seek to enjoin—constitutes an endorsement of religion.

True, local and state governments can also violate the First Amendment, and at times in the past, they have owned the Memorial site and the Cross. But they do not own or control the site and Cross now and the only relief Plaintiffs seek is an injunction against the federal government. Were this an action for damages against private owners and the City of San Diego, perhaps we could look backward at what they did. But it isn't.

Note that in all other cases where the Court discusses the history of a monument in general, the monument in question had always been on government land. Thus, the question whether the use of a symbol when under private control was not presented. In the only case where the symbol changed hands, from the federal government to a private group, the Court held that change in ownership should be considered. *See Buono*, 130 S. Ct. 1803 (plurality op.). Here we have the contrary situation of land that has been conveyed from a private group to the government. What happened while the land was privately held hardly seems relevant to the issue whether the government acted to establish religion.

The panel also made a mistake when it decided that the use of the Mt. Soledad Cross at this memorial in the last five years does not make a difference. The ownership of the memorial has changed. *Buono*, 130 S. Ct. at 1803. The evidence on this issue is undisputed—the federal government has

---

[6]The actions of private parties are particularly irrelevant because only a governmental entity can violate the Establishment Clause, not the actions of private citizens. "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend. I.

used this land *only* as a memorial to our fallen soldiers and veterans. The government has not conducted religious services at the Cross.

Further, there is no evidence here that the war memorial was an attempt by the federal government to save an otherwise solely religious symbol. The non-religious symbols put up on the Kentucky courthouse walls in *McCreary County* were found to be pretextual attempts to change the meaning of the symbol by the same persons who had installed the Ten Commandments in the first place. *See McCreary County*, 545 U.S. at 862. The non-religious plaques and bollards installed by private parties at Mt. Soledad in 2000, however, cannot serve as evidence of pretext on the part of the federal government that had nothing to do with the placement of these objects, and indeed did not even acquire the land upon which the objects had been placed until six years later.

The history and use of the site have changed, from sunrise Easter services to use solely for secular services, primarily military ceremonies. For example, in 2004 the following ceremonies took place at the Memorial: two military reunion group gatherings, two Navy retirement ceremonies, a ceremony dedicating a bollard for the Kaneohe Klippers, and about thirteen ceremonies honoring veterans. In 2005, there were sixteen ceremonies honoring veterans, one re-enlistment ceremony, one change of command ceremony, and one military reunion group gathering. In 2006, there were two re-enlistment ceremonies, one commission ceremony, two military reunion group gatherings, and about twenty-eight ceremonies honoring veterans.

There is no evidence in the record that any religious ceremonies have taken place at the Memorial since the federal government acquired the property.

Despite this evidence, the panel held that the message the Mt. Soledad Cross conveyed did not change over time. 629

F.3d at 1117. This is contrary to Supreme Court precedent, which when looking at a case involving a display of the Ten Commandments on public land, held "people 'reinterpret' the meaning of these memorials as 'historical interpretations' and 'the society around them changes.' " *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 129 S. Ct. 1125, 1137 (2009) (citation omitted). *Pleasant Grove*'s language is particularly apt where, as here, the central inquiry is, "What is the present government owner expressing by its use of the Cross?" and not what a previous "creator or donor" expressed:

> [I]t frequently is not possible to identify a single "message" that is conveyed by an object or structure, and consequently, the thoughts or sentiments expressed by a government entity that accepts and displays such an object may be quite different from those of either its creator or its donor.

*Pleasant Grove*, 129 S. Ct at 1136. Here, the same can be said. The federal government's "thoughts or sentiments" may be quite different from those of the Memorial Association (the creator) and the City of San Diego (the donor), former owners of the Memorial site.

The evidence of the changing use from a religious symbol in 1913 to exclusively a memorial symbol before the federal government acquired the land in 2006 was particularly relevant for determining whether the federal government has violated the Establishment Clause. After all, religious symbols can and do change. St. Nicholas of Bari (270-343, A.D.), the Catholic Bishop of Myra, was famous for putting coins in the shoes of persons who left them out for him and for making anonymous gifts to children. *See* http://www.newadvent.org/cathen/11063b.htm; http://en.wikipedia.org/wiki/Saint_Nicholas (both last visited August 17, 2011). Over the years, he became the model of present day Santa Claus. That he is still revered as the patron saint of repentant thieves hardly

affects his jolly and beneficent image to countless children and adults.

## IV.  At the very least, the case should be remanded for trial.

When the opposing party fails to produce evidence on an essential element of his claim—here, that the federal government's *use* of the Cross was for religious purposes rather than for secular, memorial purposes—our case law is well settled that summary judgment should be granted to the movant. *Lopez v. Pacific Maritime Ass'n*, 636 F.3d 1137, 1201-02 (9th Cir. 2011). Here, the district court correctly granted summary judgment to the government.

If, in determining whether a reasonable observer aware of all the circumstances would conclude the Cross constituted a governmental endorsement of religion, evidence other than the use by the federal government is considered relevant, then at the very least the conflict in such evidence in our record requires that the case be remanded for trial. The panel erroneously ordered that the district court should have granted appellants's motion for summary judgment.

In its "fact intensive" analysis,[7] the panel's opinion failed to discuss the expert evidence presented by the federal government in support of its cross-motion for summary judgment. Of course, we must consider this evidence when deciding whether the government raises a triable issue of material fact. Many of the factors relevant to determining the government's use of the site, the physical setting, and the history are set

---

[7]The panel also considered such irrelevant material as the anti-Semitic practice of realtors in La Jolla to bar Jewish buyers from settling there during the early part of the century, when the Cross was in private hands—a practice that has nothing to do with Mt. Soledad or this Cross—while at the same time it discounted the relevant evidence of how the federal government has used this Memorial.

forth in the declaration of Alan S. Newell, President of, and a Senior Associate Historian with, Historical Research Associates, Inc. and a professor of history at the University of Montana. He points to the following:[8]

> (1) the elimination at Mt. Soledad Memorial Park of Easter and other religious services since 1998;

> (2) the fact that when the Cross was replaced in 1954, the Mt. Soledad Memorial Association ("MSMA") continued efforts already begun by American Legion Post 275, a secular organization, to erect a new Cross "as a war memorial";

> (3) the newspaper accounts describing the site to the public as "a memorial to all those who have died in all our wars." Several newspaper reports emphasized the Memorial aspect of the Cross. The *North Shores Sentinel* stated in February 1954 that the rebuilt Cross would be dedicated 'as a memorial to American war dead' while the *La Jolla Journal* reported in April 1954 that the Cross 'will be a memorial to those who died in the last three wars.' Other newspapers noted that Admiral Miller would 'dedicate the Cross to the memory of all those who have given their lives in the nation's wars and that the Cross 'is meant to be a lasting memorial to the dead of the two world wars and the Korean fighting' ";

> (4) the memorial services held increasingly from 1972 onwards on Veterans' Day and other secular memorial days, weather permitting;

---

[8]I beg the reader's pardon for the following rather lengthy relation of evidence in the record, but I thought it necessary to point out just how clear is the basis for a trial of the basic issue of fact: would the "reasonable observer" necessarily view the Cross as a government endorsement of religion or as marking the site of a war memorial?

(5) the placement of the more than 2,100 individ-
ual, permanent memorial plaques and 23 bollards to
servicemen and women who fell in the country's ser-
vice, since the 1970s;

(6) the view of the monument, not from the free-
way where only a portion of the monument can be
seen, but on the ground at the monument, where the
plaques, bollards, flag and walls, as well as the dedi-
cation and name of the Memorial, can be seen; and,
most importantly,

(7) the Congressional enactments under which the
land was condemned and taken from the MSMA,
with explicit statements of the purpose the land and
symbol be taken for the public good of establishing
a federal memorial to the memory of the fallen sol-
diers.

Similarly, the panel found the declaration of Professor
Edward T. Linenthal, the government's expert on military his-
tory, to be merely conclusory, and summarily dismissed it as
bearing no proof on the issue whether the Cross has achieved
a secular, memorial meaning, quite apart from its religious
meaning. *See Jewish War Veterans*, 629 F.3d at 1112, n.12.
But this surely is an inaccurate and somewhat unfair reading
of Professor Linenthal's declaration, particularly when it is
entitled to every inference in its favor as proffered by the non-
moving party in opposition to Jewish War Veterans' motion
for summary judgment.[9]

On the issue whether the Cross has acquired a secular

---

[9]As the panel recognized but, alas, failed to follow, "We must deter-
mine, viewing the evidence in the light most favorable to . . . the nonmov-
ing party, whether there are any genuine issues of material fact and
whether the district court correctly applied the [relevant] substantive law."
*Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

meaning, Professor Linenthal was hardly "merely conclu-sory"; he cited several crosses used in American soldiers' memorials: "the Canadian Cross of Sacrifice [commemorating American fallen in Canada's forces before America's entry into World War I], the Mexico Civil War Memorial and the Argonne Cross Memorial at Arlington National Cemetery; the Irish Brigade Monument at Gettysburg National Military Park; a memorial to American servicemen who endured the Bataan Death March in World War II in Taos, New Mexico; an American Legion War Memorial in La Mesa, California; the Mojave Desert Cross in Mojave National Preserve; and the Father Junipero Serra statue (holding [a] cross) in the U.S. Capitol." In concluding that the Cross lacks a broadly under-stood meaning as a symbol of memorialization, the panel dis-counted certain important record facts: 114 Civil War monuments include a cross; the fallen in World Wars I and II are memorialized by thousands of crosses in foreign cemeter-ies; Arlington Cemetery is home to three war memorial crosses, and Gettysburg is home to two more; and military awards often use the image of a cross to recognize service, such as the Army's Distinguished Service Cross, the Navy Cross, the Air Force Cross, the Distinguished Flying Cross, and the most famous cross meant to symbolize sacrifice—the French "Croix de Guerre."[10]

The history behind these crosses and the simple fact that a cross has been used throughout this Nation's history as a sym-bol of respect for veterans and fallen soldiers and their valor is significant. In *Van Orden*, the Court looked to the role of the Ten Commandments in our Nation's history as one decid-ing factor in its analysis. *See* 545 U.S. at 688-90.

---

[10]In 1994, when President Bill Clinton visited the beach at Normandy in memory of D-Day, he stopped on the beach and arranged some stones into a cross in memory of the soldiers who died there. Maureen Dowd, *On Washington; Beached*, N.Y. Times, June 19, 1994, available at http://www.nytimes.com/1994/06/19/magazine/on-washington-beached .html?scp=1&sq=bill+clinton+normandy&st=nyt. For a photograph, *see* http://farm5.static.flickr.com/4131/4846400853_798d649a4a.jpg.

Just as important, the statute by which the federal government acquired ownership of the Memorial expressly states that Congress sought "to preserve a historically significant war memorial." Pub. L. 109-272 § 2(a). Congress specifically made the following findings about Mt. Soledad:

> The United States has a long history and tradition of memorializing members of the Armed Forces who die in battle with a cross or other religious emblem of their faith, and a memorial cross is fully integrated as the centerpiece of the multifaceted Mt. Soledad Veterans Memorial that is replete with secular symbols.

> The patriotic and inspirational symbolism of the Mt. Soledad Veterans Memorial provides solace to the families and comrades of the veterans it memorializes.

> The Mt. Soledad Veterans Memorial has been recognized by Congress as a National Veterans Memorial and is considered a historically significant national memorial.

An Act to Preserve the Mt. Soledad Veterans Memorial in San Diego, California, by Providing for the Immediate Acquisition of the Memorial by the United States, Pub. L. No. 109-272, § 1, 120 Stat. 770, 770 (2006).

The legislative history also contains a letter from the leaders of this country's four largest veterans service organizations, which explains that the potential destruction of the Memorial is considered an affront to veterans. 152 Cong. Rec. H5423-24 (daily ed. July 19, 2006).[11] As Representative Hunter—one of the co-sponsors of the House's version of the

---

[11]A point also made by Justice Alito in *Buono*. *See* 130 S. Ct. at 1822-23.

bill—stated when introducing the Mt. Soledad Veterans
Memorial Protection Act:

> The fight to save the Mt. Soledad Veterans Memo-
> rial is not about religion. It's about protecting a sym-
> bol of our freedom and honoring those who have
> chosen to defend it [at] all costs. Removing this long
> recognized and respected landmark is an insult to the
> men and women memorialized on its walls and the
> service and sacrifice of those who have worn a uni-
> form in defense of our nation.

As Representative Hunter explained on the House floor, the
Memorial is "without question a world-class war memorial,
dedicated to all of those, regardless of race, religion or creed,
who have served our armed services." 152 Cong. Rec. H5422
(daily ed. July 19, 2006).

Any person acquainted with all the relevant evidence and
wishing to determine whether the government meant for the
Cross to have a religious or secular use would take Congress's
findings into account.[12] Surely Congress's findings are far
more relevant than the anti-Semitic practices of realtors in the
county in the early part of the last century. Yet the panel
emphasized the latter and failed to consider the former.

When determining the issue whether a cross is traditionally
a memorial symbol for the fallen servicemen, we should grant
some deference to the reflection of the popular understanding
of the symbol, as established by Congress. *See Buono*, 130 S.
Ct. at 1818 (Congress has the discretion to enact "a frame-
work and policy of accommodation for a symbol [a cross] that

---

[12]Certainly Justice Kennedy took into account Congress's findings that
the Cross was part of a memorial in his stay order entered in this case, not-
ing Congress "deemed the monument 'a national memorial honoring vet-
erans of the United States Armed Forces.' " *San Diegans for Mt. Soledad
War Memorial v. Paulson*, 548 U.S. 1301, 1312 (2006).

. . . has complex meaning beyond the expression of religious views"); *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 320 (1985) ("deference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted" is unconstitutional).

One would think that following our long-stated rule requiring all inferences to be given in favor of the non-moving party's evidence (here, the federal government), the panel would recognize there is at least a triable issue of fact as to whether the federal government has used the site for religious purposes, whether the Cross conveys a predominantly religious or secular message given its setting, and the relevant history of the site. After all, the conflicting expert witnesses on this issue have not been cross-examined as to possible prior inconsistent statements, bias or motive. Their qualifications and demeanor have not been assessed by the trier of fact.[13]

---

[13]We should allow the trier of fact in this case to determine the *Van Orden* elements just as a trier of fact determines what a reasonable man would do in a negligence case. Indeed, even if the *Lemon* test is used, courts have analogized the "reasonable observer" or "objective observer" in the Endorsement Test to the reasonable man standard in tort law. *See, e.g., Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 779-81 (1995) (O'Connor, J., concurring in part and concurring in the judgment) ("In this respect, the applicable observer is similar to the 'reasonable person' in tort law, who 'is not to be identified with any ordinary individual, who might occasionally do unreasonable things,' but is 'rather a personification of a community ideal of reasonable behavior, determined by the [collective] social judgment.' ") (*quoting* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 175 (5th ed. 1984)).

Again, when determining whether a display has the impermissible effect "of communicating a message of governmental endorsement or disapproval" of religion, we "look[ ] through the eyes of an objective observer who is aware of the purpose, context, and history of the symbol. The objective or reasonable observer is kin to the fictitious 'reasonably prudent person' of tort law.' " *American Atheists, Inc. v. Davenport*, 616 F.3d 1145, 1159-60 (10th Cir. 2010) (citations omitted).

**Conclusion**

Removal of the Cross at this stage would pose a different Establishment Clause problem: hostility towards the role religion has played in our history, and in particular to the history of the Armed Forces. As Justice Breyer warned:

> [T]o reach a contrary conclusion here, based primarily on the religious nature of the tablets text would, I fear, lead the law to exhibit a hostility toward religion that has no place in our Establishment Clause traditions. Such a holding might well encourage disputes concerning the removal of longstanding depictions of the Ten Commandments from public buildings across the Nation. And it could thereby create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid.

*Van Orden*, 545 U.S. at 704.

Except for a brief two-year period, there has been a cross on the site since 1913. No challenge was brought to the Cross until 1989; it stood unchallenged for 76 years. This is significant because in *Van Orden* the Court found it "determinative" that the Ten Commandments monument had stood in the Texas park unchallenged for 40 years. Justice Breyer said this "suggest[ed] more strongly than any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significant detrimental way, to a government effort to favor a particular religious sect [or] primarily to promote religion over nonreligion." *Id.* Justice Breyer reasoned that the passage of 40 years suggests that visitors would simply consider the religious aspect of the display as part of "a broader moral and historical message reflective of a cultural heritage." *Id.*

San Diego is heavily influenced by and dependant on the Armed Forces. Situated between Camp Pendleton and Naval

Base San Diego, Mt. Soledad is a memorial to the sacrifice made by many soldiers who have protected this country over the years, regardless of their religion. And it is a promise to those current soldiers, a promise that we appreciate the sacrifice they are willing to make for our freedom and that, if they pay the ultimate price, we will remember them. The Cross has stood at the entrance to this memorial for almost 100 years. It has taken on the symbolism of marking the entrance to a war memorial. We should leave it be.