13-1668-cv
American Atheists, Inc. v. Port Authority of N.Y. & N.J.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

—————————

August Term, 2013

(Argued: March 6, 2014     Decided: July 28, 2014)

Docket No. 13-1668-cv

—————————

AMERICAN ATHEISTS, INC., DENNIS HORVITZ, KENNETH BRONSTEIN, JANE EVERHART,

*Plaintiffs-Appellants*,

MARK PANZARINO,

*Plaintiff,*

—v.—

PORT AUTHORITY OF NEW YORK AND NEW JERSEY, NATIONAL SEPTEMBER 11 MEMORIAL AND MUSEUM AT THE WORLD TRADE CENTER FOUNDATION, INC.,

*Defendants-Appellees*,

STATE OF NEW JERSEY, GOVERNOR CHRIS CHRISTIE, SILVERSTEIN PROPERTIES, INC., LOWER MANHATTAN DEVELOPMENT CORPORATION, CHURCH OF THE HOLY NAME OF JESUS, BRIAN JORDAN, WORLD TRADE CENTER PROPERTIES, LLC,

*Defendants.*[*]

---

Before:

RAGGI, LYNCH, and CHIN, *Circuit Judges.*

---

Plaintiffs appeal an award of summary judgment dismissing their federal and state law challenges to the display in the National September 11 Museum of an artifact denominated as "The Cross at Ground Zero," a 17-foot high column and cross-beam retrieved from World Trade Center debris that gave many the impression of a Latin cross, a symbol associated with Christianity. Plaintiffs assert that display of this artifact, particularly without any accompanying plaque or similar item acknowledging that atheists were among those who lost their lives on September 11, 2001, or who participated in ensuing rescue efforts, violates the Constitution's Establishment and Equal Protection Clauses, as well as parallel protections of New York and New Jersey state law.

AFFIRMED.

---

[*] The Clerk of Court is directed to amend the official caption as shown above.

EDWIN F. KAGIN, American Atheists, Inc., Union, Kentucky (Eric O, Husby, Esq., Tampa, Florida, *on the brief*), *for Appellants*.

MARK H. ALCOTT (Gerard E. Harper, Paul A. Paterson, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison, LLP, New York, New York, *for Appellee National September 11 Memorial and Museum at the World Trade Center Foundation, Inc.*

MEGAN LEE, The Port Authority of New York and New Jersey, New York, New York, *for Appellee Port Authority of New York and New Jersey.*

Jay Alan Sekulow, Stuart J. Roth, Jordan A. Sekulow, American Center for Law & Justice, Washington, D.C.; David A. French, Carly F. Gammill, American Center for Law & Justice, Franklin, Tennessee; Robert W. Ash, American Center for Law & Justice, Virginia Beach, Virginia, *for Amici Curiae The American Center for Law & Justice and The Committee to Protect the Ground Zero Cross.*

Steven W. Fitschen, The National Legal Foundation, Virginia Beach, Virginia, *for Amici Curiae Wallbuilders, Inc. and The National Legal Foundation.*

Matthew J. Dowd, Megan L. Brown, Brendan Morrissey, Wiley Rein LLP, Washington, D.C., *for Amicus Curiae Brian Jordan, OFM.*

Eric S. Baxter, Asma Uddin, Diana Verm, The Becket Fund for Religious Liberty, Washington, D.C., *for Amicus Curiae The Becket Fund for Religious Liberty.*

———————

REENA RAGGI, *Circuit Judge*:

On the morning of September 11, 200l, a group of Islamic terrorists murdered almost 3,000 persons by hijacking four commercial airplanes and crashing them into New York's World Trade Center, the Pentagon, and a field in Shanksville, Pennsylvania.[1] Ten years to the day after these horrific events, the current and former Presidents of the United States, Barack Obama and George W. Bush, traveled to the World Trade Center site, commonly referred to as "Ground Zero," to dedicate a National Memorial to these victims, as well as to six persons killed in the earlier 1993 terrorist bombing of the World Trade Center. More recently, on May 15, 2014, President Obama returned to Ground Zero to open a National Museum, situated underneath the Memorial and dedicated to documenting the history of the terrorist attacks and the heroic rescue efforts that followed.

This case, filed approximately three years before the Museum opened, challenges the display therein of a particular artifact recovered from World

---

[1] United Flight 93 crashed in Shanksville only because of the valiant efforts of passengers who prevented the hijackers from reaching their intended objective: the United States Capitol or the White House. See The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States 13–14 (2004).

Trade Center debris, a column and cross-beam from one of the Twin Towers that gave some who saw it, particularly rescue workers, the impression of a large Latin cross, a symbol frequently associated with Christianity. Appellants, American Atheists, Inc., and three members of that organization, Dennis Horwitz, Kenneth Bronstein, and Jane Everhart (collectively, "American Atheists"), initially contended that <u>any</u> display of the column and cross-beam, denominated by the Museum as "The Cross at Ground Zero," would violate the Constitution's Establishment and Equal Protection Clauses, <u>see</u> U.S. Const. amends. I & XIV, as well as parallel provisions of New York and New Jersey state law.[2] On this appeal from an award of summary judgment entered on March 28, 2013, in the United States District Court for the Southern District of New York (Deborah A. Batts, *Judge*), in favor of appellees, the Port Authority of New York and New Jersey ("Port Authority") and the National September 11 Memorial and Museum at the World Trade Center Foundation, Inc. ("September 11 Memorial and Museum Foundation" or "Foundation"), <u>see</u> <u>American Atheists, Inc. v. Port Auth. of N.Y. & N.J.</u>, 936 F. Supp. 2d 321, 326–27 (S.D.N.Y.

---

[2] Because American Atheists' federal claims are subject to the same analysis as their state law claims, in this opinion we discuss only the former in explaining our decision to affirm the challenged judgment.

5

2013), American Atheists abandoned this expansive argument. Conceding that The Cross at Ground Zero is an historic artifact worthy of display in the National September 11 Museum, they limit their challenge to the manner in which the Museum intends to display the cross. Specifically, American Atheists contend that the Port Authority and the Foundation impermissibly promote Christianity in violation of the Establishment Clause and deny atheists equal protection of the laws by displaying The Cross at Ground Zero in the Museum unaccompanied by some item acknowledging that atheists were among the victims and rescuers on September 11. American Atheists acknowledge that there is no historic artifact that speaks particularly to the loss of atheists' lives or to atheists' rescue efforts. Nevertheless, they submit that the district court erred in concluding that their claims failed as a matter of law because they are willing to finance an atheists' recognition plaque for display in the Museum together with The Cross at Ground Zero.

For the reasons stated herein, we conclude that American Atheists' challenge fails on the merits. Accordingly, we hereby affirm the judgment in favor of appellees.[3]

---

[3] In a recent supplemental brief requested by this court on the issue of standing, American Atheists attempt to revive their claim that <u>any</u> display of The Cross at Ground Zero in the National September 11 Museum violates the Constitution. Appellants Supp. Br. at 5. They specifically disavowed this argument, however, in their opening brief to this court. <u>See</u> Appellants Br. at 3–5 ("Plaintiffs hope not to see the Cross purged from the Museum, but seek symbolic representation of the non-religious victims and rescue workers . . . ."). Further, they reiterated that disavowal in response to inquiries from this court at oral argument:

> Mr. Kagin [Appellants' counsel]: . . . Specifically, what we seek is an object of some sort—even a plaque—that says to the judges of the world, Atheists died here too. . . .
>
> Judge Raggi: . . . So the relief you're looking at is some sort of plaque or other acknowledgment.
>
> Mr. Kagin: Yes.
>
> Judge Raggi: That's it?
>
> Mr. Kagin: That's it.

Oral Arg. Tr. 4:24–5:10. These circumstances manifest waiver of a total display challenge. <u>See</u> <u>Flores v. S. Peru Copper Corp.</u>, 414 F.3d 233, 253 n.27 (2d Cir. 2003) (identifying waiver where plaintiffs raised argument before district court but disavowed it in appellate brief); <u>see also</u> <u>In re Cacioli</u>, 463 F.3d 229, 235 n.6 (2d Cir. 2006) (identifying waiver from statements at oral argument). But whether American Atheists' challenge is to any display of The Cross at Ground

## I.    Background

On <u>de novo</u> review of a summary judgment award, we are obliged to view any disputed issues of fact in the light most favorable to the non-moving party. This case presents no disputes of material fact as is evident from American Atheists' decision not to file any response to appellees' Rule 56.1 statement in support of their summary judgment motion. <u>See</u> <u>Gubitosi v. Kapica</u>, 154 F.3d 30, 31 n.1 (2d Cir. 1998). We nevertheless recite the relevant facts in some detail because they necessarily inform our legal analysis of American Atheists' Establishment and Equal Protection Clause challenges.

### A.    The Cross at Ground Zero

In the days and weeks following the terrorist attacks of September 11, 2001, hundreds of professional and volunteer rescue workers descended on lower Manhattan where they pored through mountains of debris looking for survivors or, at least, some human remains of the thousands who had died. Two days into this grim task, on September 13, 2001, construction worker Frank Silecchia spotted in the rubble near 6 World Trade Center a large column and cross-beam, which gave him the impression of a Latin cross. Taking hope from

Zero or to a display unaccompanied by an atheist recognition plaque, it fails on the merits for the reasons stated in this opinion.

8

what he perceived to be a religious symbol, Silecchia brought the column and cross-beam to the attention of other rescue workers, many of whom shared his reaction.[4]

A few weeks later, on October 3, 2001, volunteers lifted the 17-foot column and cross-beam from the wreckage and erected it onto a platform at the West Street edge of the recovery site. The following day, almost one hundred people gathered when Father Brian Jordan, a Franciscan priest who had been blessing victim remains at Ground Zero, blessed the artifact. Soon after, Father Jordan, who also had been offering masses for workers at Ground Zero, began to conduct such services at the cross site. Persons of different faiths, or of none at

---

[4] The discovery, retrieval, and subsequent use of the column and cross-beam in religious services at Ground Zero are reported not only in the record of this litigation but also in numerous press accounts. See, e.g., Rick Hampson, Ground Zero cross a powerful symbol for 9/11 museum, USA Today, May 15, 2014, http://tinyurl.com/ocszum4 (reporting that Silecchia discovered the cross-shaped column and beam shortly after he had pulled three bodies from the rubble, and quoting Silecchia as saying that the cross was "a sign that God hadn't deserted us"); Sally Jenkins, 9/11 memorials: The story of the cross at Ground Zero, Wash. Post, Sept. 8, 2011, http://tinyurl.com/838vdsf (recounting Silecchia's discovery of cross). In conducting Establishment Clause analysis by reference to an objective or reasonable observer cognizant of circumstances surrounding a challenged display, see infra at **[25–35]**, we can assume that observer's familiarity with such accounts and, therefore, we reference them and other similar public materials in this opinion as appropriate.

all, were welcome and offered communion.  See Draft Script for Exhibit, Exh. 4 to Patterson Decl., NSMM 2202.[5]  The Cross at Ground Zero thus came to be viewed not simply as a Christian symbol, but also as a symbol of hope and healing for all persons.[6]

In 2006, construction work on the new World Trade Center Transportation Hub prompted the Port Authority to arrange for the retrieved column and cross-beam's removal from Ground Zero to an airport hangar designated as the interim repository for World Trade Center artifacts.  The plan was met by an outpouring of public support for maintaining this particular artifact at or near Ground Zero.  Accordingly, the Port Authority agreed that the column and cross-

---

[5] Attendance at what came to be known as the "Ground Zero Mass" grew from a handful to as many as 300 and, according to Father Jordan, included people of all faiths and of none at all:  "It was a matter of human solidarity.  Whether you believed was irrelevant.  We needed some type of fellowship down there, other than working."  Sally Jenkins, 9/11 memorials:  The story of the cross at Ground Zero, Wash. Post, Sept. 8, 2011, http://tinyurl.com/838vdsf (quoting Father Jordan).

[6] As Richard Sheirer, then Commissioner of New York City's Office of Emergency Management, later explained, "Intellectually, you knew it's just two pieces of steel, but you saw the impact it had on so many people, and you also knew it was more than steel."  Sally Jenkins, 9/11 memorials:  The story of the cross at Ground Zero, Wash. Post, Sept. 8, 2011, http://tinyurl.com/838vdsf; see also infra at [15] (quoting Sheirer's statement that "It didn't matter what religion you were, what faith you believed in . . .  It was life, it was survival, it was the future. . . .").

10

beam could be temporarily housed at St. Peter's Roman Catholic Church, which faces directly toward Ground Zero. There the column and cross-beam remained until 2011, when the Port Authority transferred custody of this and other Ground Zero artifacts to defendant September 11 Memorial and Museum Foundation. Before the column and cross-beam were removed from St. Peter's, members of the clergy conducted a final blessing ceremony.

B.    The September 11 Memorial and Museum

The National September 11 Memorial and Museum is located at Ground Zero. The outdoor Memorial recognizes by name each person who lost his or her life in the September 11 attacks, whether in New York, Washington, or Pennsylvania, as well as each person killed in the 1993 World Trade Center bombing.[7]  The indoor Museum is located primarily underground and directly beneath the Memorial.

---

[7] The Memorial consists of a six-acre grove of trees interrupted by two large one-acre voids marking the footprints of the World Trade Center's lost Twin Towers. Each void contains a sunken pool fed from surrounding waterfalls edged by parapet walls. Seventy-six bronze plates are attached to these walls on which are inscribed the names of 2,983 victims. The names are not arranged alphabetically but, rather, according to "relationship," as evident from persons' proximity to one another at the time of the attacks, their company or organization affiliation, or particular family requests. No distinction is drawn between atheists and

In a space of approximately 110,000 square feet, the Museum recounts the history of the September 11 attacks and their aftermath. Some 1,000 objects drawn from a collection of more than 10,000 artifacts are displayed.[8] Some of these objects are small and personal, for example, eyeglasses, an identification card, a pair of shoes, a loved one's photograph. Others are monumental, such as a 60-foot high section of the World Trade Center's slurry wall foundation, which, though cracked on September 11, successfully held back the Hudson River, preventing the flooding of lower Manhattan.[9] Other large artifacts include the unique tridents that formed the Twin Towers' façade; a 20-foot segment of the communications antenna that stood atop the North Tower; the concrete

---

religious believers. See 9/11 Memorial Guide, http://names.911memorial.org (last visited July 28, 2014).

[8] The record in this case, created before the opening of the Museum, is necessarily predictive as to anticipated displays. Because the parties have not advised us of any material changes between these predictions and the now-open Museum's actual displays, we assume none, and, thus, describe the Museum in this opinion as predicted in the record.

[9] Because the cracked slurry wall held on September 11, it too was embraced as a positive symbol "of indomitability and resilience." Holland Cotter, The 9/11 Story Told at Bedrock, Powerful as a Punch to the Gut, N.Y. Times, May 14, 2014, http://tinyurl.com/ml3mudr (reporting Museum planner Daniel Libeskind's view that slurry wall was "soul of his design" because it had "served as a multipurpose symbol of urban recovery, democracy, communal strength, the human spirit, not to mention the virtues of sound engineering").

"Survivors' Staircase," down which hundreds fled on September 11 toward the relative safety of Vesey Street; mangled fire trucks and ambulances reflective of the day's valiant rescue efforts; and a 37-foot high, 58-ton column—the last removed from Ground Zero—bearing a host of inscriptions from many who contributed to rescue and recovery efforts.

Of particular relevance to this appeal is a part of the Museum exhibition entitled "Finding Meaning at Ground Zero." It is here that The Cross at Ground Zero is displayed. The textual panel for this part of the exhibition provides visitors with the following information:

> Workers at Ground Zero struggled to come to terms with the horrific circumstances in which they found themselves. Some sought to counter the sense of utter destruction by holding on to something recognizable, whether a metal bolt or shard of glass or a marble salvaged from the debris. Others, grappling with the absence of survivors and the regular recovery of human remains, found purpose by forging relationships with relatives of a particular victim, carrying a photograph or memorial card to bolster their resolve.

> Some questioned how such a crime could have been perpetrated in the name of religion, and wrestled with how a benevolent god would permit the slaughter of thousands of innocent people. Many sought comfort in spiritual counseling, religious symbols, and the solace of ceremonies and ritual.

> Some workers turned to symbols of patriotism to reinforce a sense of commitment and community, hanging flags across the site.

> American flags reinforced a sense of commitment and community, and the repeated promise of "God Bless America" inspired a sense of duty. The words "Never Forget" commanded a pledge of unswerving dedication.

Draft Script for Exhibit, Exh. 4 to Patterson Decl., NSMM 2197. Various of the items referenced in this text are themselves displayed, either actually or photographically. Among these is the American flag that an emergency rescue worker secured from nearby Stuyvesant High School and raised on a remnant of the North Tower antenna to provide inspiration for fellow workers.[10] Also displayed are mementos that ironworkers cut from World Trade Center steel and gave as tokens of comfort to other workers and victims' relatives. These cut-outs have a variety of religious and nonreligious forms, such as the Maltese Cross, the Star of David, a heart, the Twin Towers, and the Manhattan skyline. See id. 2208–09.

Within the "Finding Meaning" section of the Museum, display of The Cross at Ground Zero is accompanied by the following textual explanation:

---

[10] The textual panel for the photograph depicting this flag raising reads: "Former U.S. Marine Rich Miller searched for survivors with fellow members of NYPD's Emergency Service Unit well into the evening of 9/11. The next day, sensing that an American flag would inspire Ground Zero rescuers, he found one at nearby Stuyvesant High School. Aided by firefighters who provided a ladder, Miller scaled a remnant of the North Tower antenna to affix[] the flag." Draft Script for Exhibit, Exh. 4 to Patterson Decl., NSMM 2205.

**The Cross at Ground Zero:  Icon of [L]oss, Symbol of Hope**

*Recovered by the New York City Building Construction and Trades Council, Courtesy of the Port Authority of New York and New Jersey*

This intersecting steel column and cross beam was found inside the rubble of 6 World Trade Center on the evening of September 13, 2001.  Upon entering the area with members of a search and rescue team, construction worker Frank Silecchia saw this 17-foot tall column, its horizontal arm draped with a heat-infused piece of air-conditioning vent, standing in a field of debris.  Moved by the spiritual presence he felt, Silecchia brought the cross shaped steel to the attention of other workers and members of the clergy.

Perceived of as a religious cross by many who saw it, the steel fragment was relocated to the edge of the site near West Street on October 3, 2001, increasing its visibility and access to both workers and visiting family members.  The next day, hundreds working on the recovery attended a ceremonial blessing of the cross by Father Brian Jordan, a Franciscan priest ministering to the Ground Zero community.

Individuals of many faiths and belief systems saw the cross as a symbol of hope, faith, and healing.

*It didn't matter what religion you were, what faith you believed in . . .  It was life, it was survival, it was the future. . . .  I would say that it represents the human spirit.  That it represents good over evil.  That it represents how people will care for each other at the worst moment in their life.  How people can put aside their differences for the greater good.*

> **Richard Sheirer, former Commissioner of New York City's Office of Emergency Management, speaking in 2010 about the Cross at Ground Zero**

Id. 2198 (boldface and italics in original).

15

C.    Prior Proceedings

American Atheists commenced this action in New York Supreme Court on July 27, 2011.  The following month, defendant Foundation removed it to the United States District Court for the Southern District of New York.  Following amended pleadings and discovery, the Foundation and the Port Authority moved for summary judgment, which the district court granted on March 28, 2013.  Although rejecting the Foundation's challenge to its characterization as a state actor, see American Atheists, Inc. v. Port Auth. of N.Y. & N.J., 936 F. Supp. 2d at 331–34, the district court concluded, as a matter of law, that neither the Foundation nor the Port Authority would violate the Establishment or Equal Protection Clauses of the Constitution or their New York and New Jersey counterparts by their intended display of the The Cross at Ground Zero in the National September 11 Museum, see id. at 334–41.

This timely appeal followed.

## II.    Discussion[11]

### A.    Establishment Clause Challenge

The First Amendment states that "Congress shall make no law respecting

an establishment of religion."  U.S. Const. amend. I.  The text does not itself

define "establishment," and the term is "not self-defining."  McCreary Cnty. v.

ACLU, 545 U.S. 844, 874–75 (2005); see Lemon v. Kurtzman, 403 U.S. 602, 612

(1971) (describing language of Establishment Clause as "opaque").  Nevertheless,

courts have long construed the Clause to prohibit the government not only from

establishing a national or state church, but also from officially favoring one

religious denomination over another, or even religion generally over nonreligion.

See McCreary Cnty. v. ACLU, 545 U.S. at 860.

While "neutrality" is thus the "touchstone" of the Establishment Clause,

that principle provides more a "sense of direction" than a determinative test.  Id.

---

[11] Although neither the Port Authority nor the Foundation challenged American Atheists' standing to pursue this lawsuit in the district court or on appeal, amicus curiae the Becket Fund argues that this jurisdictional requirement is lacking.  While we are not required to address arguments raised only by an amicus, see In re Quigley Co., 676 F.3d 45, 53 n.5 (2d Cir. 2012), we are required to assure ourselves of jurisdiction, see Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y., 316 F.3d 357, 361 (2d Cir. 2003).  Thus, we solicited further briefing from the parties and, having now reviewed those supplemental filings, all pleadings, and the record on appeal, we reject the amicus' jurisdictional challenge and proceed to the merits.

at 860, 875.  In short, neutrality is not so rigid and absolute a principle as to command "a brooding and pervasive devotion to the secular."  School Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 306 (1963) (Goldberg, J., concurring); see also Skoros v. City of New York, 437 F.3d 1, 17 (2d Cir. 2006).  Indeed, the Supreme Court recently reiterated that caution when, in rejecting an Establishment Clause challenge to legislative prayer, it observed that the Constitution no more permits the mandating of "a civic religion that stifles any but the most generic reference to the sacred" than it permits prescribing a religious orthodoxy, Town of Greece v. Galloway, 134 S. Ct. 1811, 1822 (2014); see also Lee v. Weisman, 505 U.S. 577, 627 (1992) (Souter, J., concurring) ("That government must remain neutral in matters of religion does not foreclose it from ever taking religion into account.").  Thus, in reviewing the challenged Museum display here, our standard is general rather than absolute neutrality, which we determine by reference to the three-prong analysis set forth in Lemon v. Kurtzman, 403 U.S. 602.[12]

---

[12] As we have previously observed, although the Lemon test has been much criticized, panels of this court are required to follow this precedent.  See Skoros v. City of New York, 437 F.3d at 17 n.13 (collecting cases).

Lemon instructs that for challenged government action to satisfy the neutrality principle of the Establishment Clause, it must (1) "have a secular . . . purpose," (2) have a "principal or primary effect . . . that neither advances nor inhibits religion," and (3) "not foster an excessive government entanglement with religion." Id. at 612–13 (internal quotation marks omitted); see also Skoros v. City of New York, 437 F.3d at 17–18 (explaining that each prong of Lemon analysis is informed by Supreme Court's refinements in McCreary Cnty. v. ACLU, 545 U.S. at 861–66; County of Allegheny v. ACLU, 492 U.S. 573, 592–94 (1989), abrogated on other grounds by Town of Greece v. Galloway, 134 S. Ct. 1811 (2014); and Agostini v. Felton, 521 U.S. 203, 232–33 (1997)). Upon such review here, we conclude, as the district court did, that American Atheists' Establishment Clause challenge fails as a matter of law.

1.    Purpose

At the first step of analysis, we consider whether appellees' purpose in displaying The Cross at Ground Zero in the September 11 Museum is secular, both actually and as perceived by an objective observer. See McCreary Cnty. v. ACLU, 545 U.S. at 863; Lynch v. Donnelly, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring). In doing so, we are mindful that Lemon's secular purpose

19

requirement "is not intended to favor the secular over the religious, but to prevent government from 'abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.'" Skoros v. City of New York, 437 F.3d at 18 (quoting Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 335 (1987)).

a.    Actual Purpose

As a matter of law, the record compels the conclusion that appellees' actual purpose in displaying The Cross at Ground Zero has always been secular: to recount the history of the terrorist attacks of September 11, 2001, and their aftermath. This is evident from correspondence dating to 2006, eight years before the Museum opened. Therein, a Foundation official writes to the executive director of the Port Authority to confirm their "mutual understanding" that

> the cross-shaped artifact at Ground Zero [is an] . . . important and essential artifact [that] belongs at the World Trade Center site as it comprises a key component of the re-telling of the story of 9/11, in particular the role of faith in the events of the day and, particularly, during the recovery efforts. Its presentation will help to convey, with sensitivity and significance, this critical part of the story to the many visitors expected to come to the site for years to come.

Dykstra Letter to Ringler, 5/11/06, Exh. 1 to Patterson Decl. We generally defer to such a statement of purpose absent some reason to think it is a sham, which is not evident here. See McCreary Cnty. v. ACLU, 545 U.S. at 864–65; accord Skoros v. City of New York, 437 F.3d at 19–22.

In urging otherwise, American Atheists do not dispute that The Cross at Ground Zero is a genuine historical artifact of recovery and healing efforts after the September 11 attacks. Rather, they contend that appellees' actual purpose must be religious because the cross's particular historical significance derives from its religious symbolism and devotional use. In short, because the historical significance of this particular column and cross-beam is as a tangible illustration of the role faith played for many persons in the aftermath of the September 11 attacks, appellees' actual purpose in displaying the artifact must be religious rather than secular. We reject this reasoning.

American Atheists point to no precedent holding that when a religious symbol or artifact with genuine historical significance is included in a public historical display, the actual purpose is necessarily religious promotion. To the contrary, the Supreme Court has long recognized that an accurate account of human history frequently requires reference to religion: "The history of man is

21

inseparable from the history of religion." Engel v. Vitale, 370 U.S. 421, 434 (1962). Indeed, as Justice Jackson observed in Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203 (1948) (Jackson, J., concurring), "it is a proper, if not an indispensable, part of preparation for a worldly life to know the roles that religion and religions have played in the tragic story of mankind. The fact is that, for good or for ill, nearly everything in our culture worth transmitting, everything that gives meaning to life, is saturated with religious influences," id. at 236; see also Edwards v. Aguillard, 482 U.S. 578, 607 (1987) (Powell, J., concurring) (observing that "since religion permeates our history, a familiarity with the nature of religious beliefs is necessary to understand many historical as well as contemporary events"). Thus, the Establishment Clause is not properly construed to command that government accounts of history be devoid of religious references. Nor is a permissible secular purpose transformed into an impermissible religious one because the government makes an historical point with an artifact whose historical significance derives, in whole or in part, from its religious symbolism. See Corporation of Presiding Bishop v. Amos, 483 U.S. at 335 (holding that secular purpose prong of Lemon test "does not mean [government] purpose must be unrelated to religion"); see also Van Orden v.

<u>Perry</u>, 545 U.S. 677, 699 (2005) (Breyer, J., concurring) (observing that "Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious").

Here, appellees' secular historical purpose in displaying The Cross at Ground Zero is further evident from their documented account of interactions with religious groups emphasizing that, once placed in the Museum, the artifact's singular import will be historical, and no longer venerational:

> [M]embers of the Lower Manhattan Clergy Council and New York Disaster Interfaith Services . . . fully endorse our understanding that as a public institution, the World Trade Center Memorial Foundation should present this artifact in a way that tells the story of 9/11 and not as an object of veneration. As a public institution, we will not explicitly offer religious services in association with the artifact. Here again, the Clergy Council was fully and emphatically in agreement.

Dykstra Letter to Ringler, 5/11/06, Exh. 1 to Patterson Decl.

Appellees' actual secular purpose is also apparent in the display design for The Cross at Ground Zero. As detailed in the above background discussion, <u>see supra</u> at **[11–15]**, a textual panel explains that Ground Zero workers "struggled to come to terms with the horrific circumstances in which they found themselves," and then documents—as history properly does—various ways that they did so: through human interactions, mementos retrieved from the attack

23

site, religious symbols and ritual, patriotic displays, etc. While The Cross at Ground Zero, the largest artifact displayed to make this point, is a religious symbol that was used in connection with religious rituals at the attack site, the accompanying textual panel is plainly historical rather than theological in recounting the facts of discovery and subsequent use by "[i]ndividuals of many faiths and belief systems . . . as a symbol of hope, faith, and healing." Draft Script for Exhibit, Exh. 4 to Patterson Decl., NSMM 2198.[13] Indeed, consistent with the historical fact of the cross's wide adoption by diverse persons, the text makes no mention of the Christian iconography usually associated with a Latin cross. Rather, this particular cross's broader significance is reflected in a quotation attributed to New York City's former Commissioner of Emergency Management, who recounts how the cross came to represent "the human spirit," and "good over evil," for numerous people, no matter "what religion you were, what faith you believed in." Id.

---

[13] Insofar as American Atheists emphasize the size of the cross in arguing that its display violates the Establishment Clause, the record does not admit the conclusion that appellees chose to exhibit this artifact because its size would most effectively promote religion. Rather, size was what informed rescue workers' identification and recovery of the cross as well as their perception of it as a symbol inspiring hope amid the vast devastation at Ground Zero. In short, size is part of the cross's historical significance, not an indicator that appellees' actual purpose in displaying it is religious promotion.

24

Given these documented demonstrations of appellees' secular historical purpose, the absence of any evidence of ulterior religious motives, and the undisputed historical significance of The Cross at Ground Zero, we conclude that, as a matter of law, the record compels the conclusion that the actual purpose of displaying the cross in the September 11 Museum is a genuine secular interest in recounting the history of extraordinary events.

b. Perceived Purpose

American Atheists maintain that even if appellees' actual purpose is secular, an "objective observer" would necessarily perceive it to be religious because a Latin cross is an inherently religious symbol, and this particular cross-shaped artifact was used in connection with religious devotions at Ground Zero.[14]  The argument is not persuasive.[15]

---

[14] While American Atheists appear to view the question of how an objective observer would view appellees' purpose as one of fact requiring jury resolution, precedent treats the issue as a fact-intensive question of law.  See Elewski v. City of Syracuse, 123 F.3d 51, 53–54 (2d Cir. 1997) (citing Lynch v. Donnelly, 465 U.S. at 694 (O'Connor, J., concurring)); see also Commack Self-Serv. Kosher Meats, Inc. v. Hooker, 680 F.3d 194, 205–07 (2d Cir. 2012) (analyzing objective observer purpose inquiry as question of law); Skoros v. City of New York, 437 F.3d at 29–35 (same for effects test).

[15] If such an argument were persuasive, the Establishment Clause might prevent display in the National Gallery of any number of artistic masterpieces that were

The objective observer whose perception of purpose must be considered at the first step of Lemon analysis is one possessing not only basic familiarity with the charged display but also reasonable knowledge of the overall circumstances attending the display. See McCreary Cnty. v. ACLU, 545 U.S. at 862 (describing objective observer as "one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute" or comparable act charged with violating the Establishment Clause (internal quotation marks omitted)); Skoros v. City of New York, 437 F.3d at 22; see also Weinbaum v. City of Las Cruces, 541 F.3d 1017, 1031 n.16 (10th Cir. 2008) (stating that "the 'objective observer' is presumed to know far more than most actual members of a given community"). Thus, an objective observer would be familiar not only with the religious symbolism of a Latin cross and the devotional use made of The Cross at Ground Zero, but also with the referenced documentary material, which, from 2006 to the present, makes plain that appellees' singular purpose in displaying the cross is the secular one of providing an accurate

once incorporated into altarpieces or used in religious devotions. See, e.g., Tilman Riemenschneider, "The Münnerstadt Altarpiece" (1490–92) (from Church of Mary Magdalen); Duccio di Buoninsegna, "The Nativity with the Prophets Isaiah and Ezekiel (1308/1311) (from predella of Sienese altarpiece; "Chalice of the Abbot Suger of Saint-Denis" (2d/1st century B.C. (cup); 1137–1140 (mounting)) (vessel used to celebrate mass).

historical account of events relating to September 11. An objective observer would know that appellees had specifically advised religious groups that had used the cross devotionally that such use would cease with transfer of the cross to the Foundation.[16]

The observer would know also that the cross is displayed in a section of the museum that textually acknowledges various ways—many not religious—that people employed "to come to terms with the horrific circumstances" of September 11. Script for Exhibit, Exh. 4 to Patterson Decl., NSMM 2197. He would know that the textual explanation of The Cross at Ground Zero makes no reference to Christian iconography but, rather, recounts historical facts about the cross's discovery and use, with particular emphasis on how it came to be seen "as a symbol of hope, faith, and healing" by numerous persons, without regard to their "belief systems." Id. at 2198.

---

[16] Awareness of the cited background materials would prevent an objective observer from concluding, as American Atheists urge, that the Port Authority's agreement to allow The Cross at Ground Zero to be housed at St. Peter's Church from 2006 to 2011, signals that appellees' purpose in thereafter displaying the cross in the September 11 Museum was religious promotion. Nor is a different conclusion warranted because clergy blessed the cross before surrendering its possession back to appellees. Rather, when the blessing is considered in light of the referenced correspondence, an objective observer would recognize that ritual as marking the last moment when the cross played a devotional role before assuming a singularly historical one.

The observer would know that the absence of any reference to "atheists" in the Museum's "Finding Meaning" exhibition derives from the fact that, as American Atheists themselves acknowledge, there is no artifact showing a particular way that atheists, as distinguished from persons generally, tried to find meaning in the events of September 11. Insofar as American Atheists propose a plaque that would acknowledge that atheists were among the victims and rescuers on September 11, an objective observer would know both that such a plaque was not an "artifact," and that it did not speak to the point of the exhibition section, i.e., how people found meaning at Ground Zero. He would further know that every victim of the September 11 and 1993 attacks is identified by name on the Memorial plaques without regard to religious affiliation, and depicted both visually and textually in the Museum's commemorative display. See Holland Cotter, The 9/11 Story Told at Bedrock, Powerful as a Punch to the Gut, N.Y. Times, May 14, 2014, http://tinyurl.com/ ml3mudr (reporting that Museum commemorative display presents "[p]hotographs of nearly 3,000 people . . . along with biographical portraits and spoken reminiscences [that] can be pulled up on touch screens and projected large in another room").

We conclude that an objective observer cognizant of all these circumstances could not perceive appellees' purpose in displaying The Cross at Ground Zero to be religious promotion. Rather, he would necessarily perceive their purpose to be the secular one of providing accurate historical insight into the various means by which people tried to cope with the devastation of the September 11 attacks.

### 2. Primary Effect

The second prong of the <u>Lemon</u> test requires that the "principal or primary effect" of the challenged government action "neither advance nor inhibit religion." <u>Skoros v. City of New York</u>, 437 F.3d at 29 (internal quotation marks omitted). This mandate is often cast in terms of endorsement: "Would a reasonable observer of the display in its particular context perceive a message of governmental endorsement or sponsorship of religion?" <u>Elewski v. City of Syracuse</u>, 123 F.3d 51, 53 (2d Cir. 1997); <u>accord</u> <u>Bronx Household of Faith v. Bd. of Educ. of the City of New York</u>, 650 F.3d 30, 40–41 (2d Cir. 2011).[17]

---

[17] Because American Atheists profess to challenge government speech, endorsement analysis properly applies. <u>See</u> <u>Capitol Square Review & Advisory Bd. v. Pinette</u>, 515 U.S. 753, 763–70 (1995) (plurality opinion) (suggesting that endorsement test should be limited to government speech or discrimination); <u>Skoros v. City of New York</u>, 437 F.3d at 29 n.25 (noting Court division on issue).

Justice O'Connor, the principal architect of the "endorsement test," has explained that endorsement is not limited to government coercion or proselytization; rather, it takes account of "the numerous more subtle ways that government can show favoritism to particular beliefs or convey a message of disapproval to others." County of Allegheny v. ACLU, 492 U.S. at 627–28 (O'Connor, J., concurring in part and concurring in judgment). This is not to suggest, however, that nonbelievers can demand that courts "sweep away all government recognition and acknowledgment of the role of religion in the lives of our citizens." Id. at 623. "[G]overnment can acknowledge the role of religion in our society in numerous ways that do not amount to an endorsement." Id. at 631 (emphasis in original). What endorsement does not permit is government making "a person's religious beliefs relevant to his or her standing in the political community," id. at 627, thereby sending "a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community," Lynch v. Donnelly, 465 U.S. at 688 (O'Connor, J., concurring). As the record demonstrates, that is not the effect of the challenged cross display.

Endorsement is assessed by reference to a "reasonable observer." Like the "objective observer," the "reasonable observer" is "not a particular individual, but 'a personification of a community ideal of reasonable behavior.'" Skoros v. City of New York, 437 F.3d at 30 (quoting Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in judgment)); accord Salazar v. Buono, 559 U.S. 700, 721 (2010) (plurality opinion) (stating that reasonable observer test requires "hypothetical construct of an objective observer who knows all of the pertinent facts and circumstances surrounding the symbol and its placement"). Such an observer would be aware of circumstances already referenced with respect to purpose, including the knowledge that historical events are often informed by persons' religious beliefs, and that the Establishment Clause does not require disavowal of this reality. See supra at **[21–25]**; see also Salazar v. Buono, 559 U.S. at 719 ("The Constitution does not oblige government to avoid any public acknowledgement of religion's role in society."); Lee v. Weisman, 505 U.S. at 598 ("A relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution.").

The observer would further know that, in troubling times, many persons find comfort in prayer and religious rituals, see School Dist. of Abington Twp. v. Schempp, 374 U.S. at 212–13 (recognizing that "since the beginning of . . . history many people have devoutly believed that 'More things are wrought by prayer than this world dreams of.'"), and that this was certainly the case in the aftermath of the September 11 attacks.[18]  Possessed of such knowledge, the observer would recognize discovery of The Cross at Ground Zero and its subsequent use in religious rituals as historical facts significant to illustrating how human beings, notably Ground Zero rescue workers and the relatives of survivors, could find some source of hope and comfort even when confronting the extraordinary death toll and destruction of September 11.  With this recognition, a reasonable observer would view the primary effect of displaying The Cross at Ground Zero, amid hundreds of other (mostly secular) artifacts, to be ensuring historical completeness, not promoting religion.  See generally Lynch

---

[18] See generally President George W. Bush, Remarks at the 9/11 Remembrance Ceremony at the National Cathedral (Sept. 14, 2001), available at http://tinyurl.com/washpo9142001 ("We come before God to pray for the missing and the dead, and for those who loved them."); see also Mark Landler & Eric Schmitt, Bush and Obama, Shoulder to Shoulder, N.Y. Times, Sept. 11, 2011, http://tinyurl.com/mua8oqz (reporting that on tenth anniversary of September 11 attacks, President Obama "read from Psalm 46:  'God is our refuge and strength'").

v. Donnelly, 465 U.S. at 683 (observing by analogy to challenged holiday display that "exhibition of literally hundreds of religious paintings in governmentally supported museums" does not endorse religion); id. at 692 (O'Connor, J., concurring) (noting that "typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content"); see also Van Orden v. Perry, 545 U.S. at 702 (Breyer, J., concurring in judgment) (concluding that inclusion of multiple objects illustrating ideals of those who settled Texas dissipated religious message of Ten Commandments).[19]

Indeed, that conclusion would only be reinforced by the textual panels accompanying the "Finding Meaning" exhibition generally and the cross display in particular. These both (1) identify religious symbols and rituals as among various means that people employed to come to terms with the attacks' devastation, and (2) emphasize that "[i]ndividuals of many faiths and belief

---

[19] The large size of the cross warrants no different conclusion not only because it is only one of a number of massive items displayed, see supra at **[12–13]**, but also because it is by no means obvious that the effect of a large object is always greater than a small one. See Holland Cotter, The 9/11 Story Told at Bedrock, Powerful as a Punch to the Gut, N.Y. Times, May 14, 2014, http://tinyurl.com/ml3mudr (observing that largest objects displayed in Museum are "easie[r] to take, maybe because of their public identity, or even their resemblance to contemporary sculpture" than the "hundreds of small, battered personal items . . . [i]nfused with lost life").

systems" viewed The Cross at Ground Zero as a symbol of various positive expressions, i.e., as a symbol of "hope, faith, and healing," of "the human spirit," and of "how people will care for each other at the worst moment in their life." Script for Exhibit, Exh. 4 to Patterson Decl., NSMM 2198.

A reasonable observer would further know that there is no distinct artifact from which atheists, as a group, drew hope and comfort in the aftermath of September 11. Thus, this is not a case in which appellees have chosen to display a symbol of hope embraced by religious believers at Ground Zero while at the same time refusing to display a symbol of hope embraced by nonbelievers at Ground Zero. Cf. Skoros v. City of New York, 437 F.3d at 27 (rejecting Establishment Clause challenge to Board of Education's refusal to allow crèche display along with menorah, Christmas tree, and other symbols of year-end holidays, while recognizing "possibility that, in some circumstances, a government's deliberate exclusion of the religious symbol of one faith from a display that includes the religious symbols of other faiths could communicate the official favoritism or hostility among religious sects that is prohibited by the Establishment Clause").

From the totality of these circumstances, a reasonable observer would understand that The Cross at Ground Zero, while having religious significance to many, was also an inclusive symbol for any persons seeking hope and comfort in the aftermath of the September 11 attacks. Such an observer would not understand the effect of displaying an artifact with such an inclusive past in a Museum devoted to the history of the September 11 attacks to be the divisive one of promoting religion over nonreligion. Nor would he think the primary effect of displaying The Cross at Ground Zero to be conveying a message to atheists that they are somehow disfavored "outsiders," while religious believers are favored "insiders," in the political community. Lynch v. Donnelly, 465 U.S. at 688 (O'Connor, J., concurring).

Accordingly, we identify no concern with the challenged cross display at the second step of Lemon analysis.

### 3. Entanglement

Lemon's final concern—excessive state entanglement with religion—rests on the premise that "both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." Commack Self-Serv. Kosher Meats, Inc. v. Weiss, 294 F.3d 415, 425 (2d Cir. 2002)

35

(internal quotation marks omitted).  The inquiry is necessarily one of "kind and degree," Lynch v. Donnelly, 465 U.S. at 684; see Agostini v. Felton, 521 U.S. at 233 (recognizing that not all entanglements enhance or inhibit religion), and is often informed by the same facts and arguments as the effects or endorsement analysis, see Commack Self-Serv. Kosher Meats, Inc. v. Hooker, 680 F.3d at 205; Skoros v. City of New York, 437 F.3d at 18 (referencing link drawn in Agostini v. Felton, between second and third prongs of Lemon analysis).

Thus, to the extent American Atheists rely on their endorsement arguments to complain of excessive entanglement, we have already explained why we find these arguments unpersuasive.  In any event, the decision to display an object with religious significance in a public museum does not manifest entanglement unless religious authorities played a role in that decision, for which there is no record evidence here.  Compare Lynch v. Donnelly, 465 U.S. at 684 (identifying no excessive entanglement in absence of any evidence of contact with church authorities concerning content or design of exhibit prior to or since city's purchase of crèche), with Commack Self-Serv. Kosher Meats, Inc. v. Weiss, 294 F.3d at 425 (identifying excessive entanglement where state delegated civic authority to individuals chosen according to religious criteria).

The fact that the Port Authority contacted Father Jordan regarding the prayer and blessing that marked the physical transfer of The Cross at Ground Zero from St. Peter's Church to the Foundation is not to the contrary, as there is no record basis to think that ceremony informed appellees' decision as to whether and how to display the artifact in the Museum, the matters challenged here.

Entanglement concerns can also arise where extensive monitoring is required to ensure that a public entity is not promoting religion. See, e.g., Lemon v. Kurtzman, 403 U.S. at 619 (identifying excessive entanglement where policy of financial support for nonsectarian curriculum of parochial schools would require "comprehensive, discriminating, and continuing state surveillance"). No such concern is present here where the challenged exhibit will be static, and the same public entity, the September 11 Museum, would be both the monitored and monitoring actor. See Skoros v. City of New York, 437 F.3d at 36–37 (identifying no excessive entanglement where state monitors actions of public schools but not sectarian institutions).

American Atheists having pointed us to no other way in which Museum display of The Cross at Ground Zero risks excessive entanglement, we conclude that this final Lemon factor raises no concerns.

In sum, because the record demonstrates, as a matter of law, that Museum display of The Cross at Ground Zero does not violate the Establishment Clause, we conclude that judgment was correctly entered in favor of appellees on this First Amendment claim.

B.      Equal Protection Challenge

American Atheists contend that appellees' Museum display of The Cross at Ground Zero denies them equal protection of the laws. Specifically, they contend that a display of the cross without an accompanying atheist recognition plaque discriminates against atheists by "trivializ[ing]" how non-Christians experienced and coped with the events of September 11. Appellants Br. at 30. The claim fails as a matter of law.

As American Atheists acknowledge, appellees' choice as to which artifacts to display in recounting the history of the September 11 attacks is a form of government speech. Individuals will generally not be heard to complain that government speech favors one viewpoint over another unless, in the context of a religious discrimination claim, the challenged speech violates the Establishment Clause. See Pleasant Grove City v. Summum, 555 U.S. 460, 467–68 (2009) (collecting cases recognizing that "[i]t is the very business of government to favor

and disfavor points of view," and that a government entity is "entitled to say what it wishes . . . and to select the views it wants to express" as long as its speech "comport[s] with the Establishment Clause" (internal quotation marks and citation omitted)).  For reasons already explained, appellees' display of The Cross at Ground Zero without an accompanying atheist recognition plaque comports with the Establishment Clause.

Moreover, as the district court correctly concluded, American Atheists fail to adduce evidence from which a reasonable trier of fact could conclude that appellees' display decisions were animated by discriminatory animus toward atheists.  See Pyke v. Cuomo, 567 F.3d 74, 76 (2d Cir. 2009) (referencing various ways for demonstrating intentional discrimination violative of equal protection). Nothing in the record indicates that (1) appellees' display decisions were based on a policy that expressly classified on the basis of religion, (2) appellees employed a facially neutral display policy in a religiously discriminatory manner, or (3) a facially neutral display policy has an adverse effect on atheists motivated by religiously discriminatory animus.  See id.

Indeed, a demonstration of intentional discrimination by any of these means is effectively foreclosed by a host of factors including American Atheists'

39

own acknowledgements that The Cross at Ground Zero is a genuine historic artifact warranting display in the Museum's "Finding Meaning" exhibition, and that no comparable artifact exists to give tangible form to how atheists—as distinct from persons generally, or Christians in particular—came to terms with the September 11 attacks. No reasonable factfinder could conclude that appellees trivialize atheists' September 11 experience when both the Memorial and the Museum identify every person killed in the attacks of that day without regard to religious affiliation. Further, the Museum's "Finding Meaning" exhibition respectfully reports that people employed a variety of nonreligious, as well as religious, means to cope with the September 11 attacks. See supra at [13, 28–29]. As for the challenged cross, at the same time that a textual panel reports the historical fact that people viewed it as a religious symbol, it also states the further historical fact that still more people, without regard to their religious affiliation, embraced the cross as a broader symbol of hope, life, and the human spirit.

Thus, we conclude that the Equal Protection Clause does not bar appellees from displaying the Cross at Ground Zero in the National September 11 Museum, not does it require them to supplement the Museum's "Finding Meaning" exhibition with an atheist recognition plaque, as appellants propose.

40

## III. <u>Conclusion</u>

To summarize, we conclude as follows:

1.      Displaying The Cross at Ground Zero in the National September 11 Museum does not violate the Establishment Clause because:

      a.      the stated purpose of displaying The Cross at Ground Zero to tell the story of how some people used faith to cope with the tragedy is genuine, and an objective observer would understand the purpose of the display to be secular;

      b.      an objective observer would not view the display as endorsing religion generally, or Christianity specifically, because it is part of an exhibit entitled "Finding Meaning at Ground Zero"; the exhibit includes various nonreligious as well as religious artifacts that people at Ground Zero used for solace; and the textual displays accompanying the cross communicate its historical significance within this larger context; and

      c.      there is no evidence that the static display of this genuine historic artifact excessively entangles the government with religion.

2.      In the absence of any Establishment Clause violation or any evidence of discriminatory animus toward atheists, the Museum did not deny

equal protection by displaying The Cross at Ground Zero and refusing plaintiffs' request to fund an accompanying symbol commemorating atheists.

Accordingly, the district court's award of summary judgment is AFFIRMED.