**PUBLISHED**
FILED: March 1, 2018

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 15-2597
(8:14-cv-00550-DKC)
_____

AMERICAN HUMANIST ASSOCIATION; STEVEN LOWE; FRED EDWORDS;
BISHOP MCNEILL

        Plaintiffs - Appellants

v.

MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION

        Defendant - Appellee

THE AMERICAN LEGION; THE AMERICAN LEGION DEPARTMENT OF
MARYLAND; THE AMERICAN LEGION COLMAR MANOR POST 131

        Intervenors/Defendants - Appellees

------------------------------

FREEDOM FROM RELIGION FOUNDATION; CENTER FOR INQUIRY

        Amici Supporting Appellant

THE BECKETT FUND FOR RELIGIOUS LIBERTY; JOE MANCHIN; DOUG
COLLINS; VICKY HARTZLER; JODY HICE; EVAN JENKINS; JIM JORDAN;
MARK MEADOWS; ALEX MOONEY; STATE OF WEST VIRGINIA; STATE OF
ALABAMA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF
FLORIDA; STATE OF GEORGIA; STATE OF HAWAII; STATE OF IDAHO;
STATE OF INDIANA; STATE OF KANSAS; STATE OF KENTUCKY; STATE OF
LOUISIANA; STATE OF MICHIGAN; STATE OF MONTANA; STATE OF
NEVADA; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF

OKLAHOMA; STATE OF RHODE ISLAND; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS; STATE OF UTAH; STATE OF VIRGINIA; STATE OF WISCONSIN

Amici Supporting Appellee

FOUNDATION FOR MORAL LAW

Amicus Supporting Rehearing Petition

_____

O R D E R
_____

On a requested poll of the court on appellees' petitions for rehearing en banc, a majority of active judges voted to deny rehearing en banc. Judge Motz, Judge Duncan, Judge Keenan, Judge Wynn, Judge Diaz, Judge Floyd, Judge Thacker, and Judge Harris voted to deny rehearing en banc. Chief Judge Gregory, Judge Wilkinson, Judge Niemeyer, Judge Traxler, Judge King, and Judge Agee voted to grant rehearing en banc.

The petitions for rehearing en banc are denied.

Judge Wynn filed a concurring opinion, and Chief Judge Gregory, Judge Wilkinson, and Judge Niemeyer filed dissenting opinions.

Entered at the direction of Judge Thacker.

For the Court

/s/ Patricia S. Connor, Clerk

2

WYNN, Circuit Judge, voting to Deny the Petition to Rehear:

In seeking rehearing of this case en banc, Petitioner Maryland-National Capital Park & Planning Commission, a state entity (the "Commission"), again asks this Court to hold that Maryland's ownership and maintenance of the Bladensburg Cross—a 40-foot tall Latin cross erected at an intersection in Prince George's County—*does not* have the "principal or primary effect" of advancing the Christian faith. Appellee's Pet. for Reh'g En Banc at 12. Rather, according to the Commission, this Court should conclude that the Bladensburg Cross has lost its predominantly sectarian meaning, to the extent that it ever had any such meaning, and now stands as a symbol of the soldiers who died on the field of battle in World War I.

But the Latin cross has for centuries been widely recognized as "the pre-eminent symbol of Christianity."[1] Nothing in the First Amendment empowers the judiciary to

---

[1] *Trunk v. City of San Diego*, 629 F.3d 1099, 1110 (9th Cir. 2011); *see also, e.g.*, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943) ("Symbolism is a primitive but effective way of communicating ideas. The use of an emblem . . . to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. . . . [T]he church speaks through the Cross, the Crucifix, the altar and shrine, and clerical reiment."); *Salazar v. Buono*, 559 U.S. 700, 747 (2010) (Stevens, J., dissenting) ("We have recognized the significance of the Latin cross as a sectarian symbol, and no participant in this litigation denies that the cross bears that social meaning." (citing, e.g., *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 776 (1995) (O'Connor, J., concurring in part and concurring in judgment) (expressing concern because "the cross is an especially potent sectarian symbol which stood unattended in close proximity to official government buildings"); *id.* at 792 (Souter, J., concurring in part and concurring in judgment) ("[T]he Latin cross . . . is the principal symbol of Christianity around the world."); *id.* at 798 n.3 (Stevens, J., dissenting) ("[T]he Latin cross is identifiable as a symbol of a particular religion, that of Christianity; and, further, as a symbol of particular denominations within Christianity."))).

3

conclude that the freestanding Latin cross has been divested of this predominately sectarian meaning.

Our holding that the State's ongoing ownership and maintenance of the Bladensburg Cross violated the Establishment Clause recognizes that to hold otherwise would require this Court to accept the Commission's conclusion that the Latin cross *does not* have the "principal or primary effect" of advancing the Christian faith. To give the judiciary the power to prescribe and proscribe the meaning of an unadorned, traditionally religious symbol like the Latin cross would infringe on intensely personal and sacred questions of religious meaning and belief. [2] Such governmental prescription of religious belief would serve only to "degrade religion"—one of the principal outcomes the Framers of the Religion Clauses sought to forestall. *Engel v. Vitale*, 370 U.S. 421, 431 (1962).

The First Amendment provides that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Although "tension inevitably exists between the Free Exercise and the Establishment Clauses," *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 788 (1973), both Religion Clauses serve at least one common purpose: the prevention of governmental interference in matters of faith.

---

[2] According to recent polling, adults who identify as adherents of Christianity comprise approximately 75% of the United States population. *E.g.*, Frank Newport, *Percentage of Christians in U.S. Drifting Down, but Still High*, Gallup News (Dec. 24, 2015), http://news.gallup.com/poll/187955/percentage-christians-drifting-down-high.aspx.

The Free Exercise Clause, in particular, protects "first and foremost the right to believe and profess whatever religious doctrine one desires." *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990), *superseded on other grounds by statute*, 42 U.S.C. §§ 2000bb-1; *see also City of Boerne v. Flores*, 521 U.S. 507, 550 (1997) (O'Connor, J., dissenting) ("[T]he historical record indicates that [the Framers] believed that the Constitution affirmatively protects religious free exercise and that it limits the government's ability to intrude on religious practice."). Put differently, the Free Exercise Clause endows individuals and religious institutions with the "power to decide for themselves, free from state interference, matters . . . of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.A.*, 344 U.S. 94, 116 (1952). The clause, therefore, amounts to an "unflinching pledge to allow our citizenry to explore diverse religious beliefs in accordance with the dictates of their conscience." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984). To that end, the Free Exercise Clause prohibits the government, and the judiciary in particular, from entertaining, much less resolving, questions that turn on issues of religious doctrine, practice, and belief. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 188 (2012) (holding that the Free Exercise Clause prohibits courts from resolving claims "concerning the employment relationship between a religious institution and its ministers"); *Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich*, 426 U.S. 696, 720 (1976) (holding that the "First Amendment commits exclusively to the highest ecclesiastical tribunals . . . the resolution of quintessentially religious controversies").

5

The Establishment Clause likewise protects against governmental interference in religious matters. As the Supreme Court has recognized, the "first and most immediate purpose [of the Establishment Clause] rested on the belief that a union of government and religion tends to destroy government *and to degrade religion*." *Engel*, 370 U.S. at 431 (emphasis added); *Catholic High Sch. Ass'n of Archdiocese of N.Y. v. Culvert*, 753 F. 2d 1161, 1162–63 (2d Cir. 1985) ("[The Religion Clauses] must be constantly manned, the Founding Fathers believed, lest there be a union between church and state that will first degrade and eventually destroy *both*." (emphasis added)). "The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate." *Engel*, 370 U.S. at 431–32. In other words, the Establishment Clause protects "not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil polity, but in as high degree . . . the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government." *School of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 258 (1963) (Brennan, J., concurring).

The Religion Clauses' animating concern with governmental intrusion on and degradation of religious belief stems from the colonists' experience and unease with the consequences of state control over religious institutions and beliefs. The Puritans fled England to escape the monarchy's prescription of tenets of belief and modes of worship. *Hosanna-Tabor*, 565 U.S. at 182–83. And other settlers sought to escape what they saw as "the corruptive influence of secular statism on religious purity." *Brandon v. Bd. of*

6

*Educ. of Guilderland Cent. Sch. Dist.*, 635 F.2d 971, 974 (2d Cir. 1980). As James Madison, the principal drafter of the Religion Clauses, explained, "experience" revealed "that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation." James Madison, *Memorial and Remonstrance Against Religious Assessments* ¶ 7 (1785), *in* II Writings of James Madison 187 (1901), and quoted in *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 67 (1947) [hereinafter *Remonstrance*].

To allow this Court to circumscribe the Bladensburg Cross's meaning and power, as the Commission and its amici request, would empower this Court to diminish the Latin cross's many years of accrued religious symbolism, and thereby amount to the state degradation of religion that the Framers feared and sought to proscribe. Indeed, were this Court to accept that the Latin cross's predominantly sectarian meaning could be overcome by a plaque, a small secular symbol, and four engraved words, as the Commission maintains, we would necessarily grant the government—and the judiciary, in particular—broad latitude to define and shape religious belief and meaning. Surely, the Constitution does not contemplate endowing the government with such extraordinary power to determine and prescribe individual citizens' religious beliefs and religious communities' joint understandings, appreciations, and teachings. *See, e.g.*, *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632–33 (1943) ("A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn.").

7

Importantly, this is not a case in which a religious symbol or text is displayed as part of historical presentation that has a predominately secular purpose. *See Van Orden v. Perry*, 545 U.S. 677, 701 (2005) (Breyer, J., concurring) (surrounding context revealed Ten Commandments display conveyed primarily historical and moral meaning). Nor is it a case in which the government is displaying a religious symbol as a "historical artifact," thus permitting each individual to imbue the symbol with her own meaning. *See Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J.*, 760 F.3d 227, 238–42 (2d Cir. 2014) (surrounding context of display in 9/11 museum of "cross-shaped artifact" that naturally appeared in wreckage of the World Trade Center demonstrated that artifact was displayed, not for a religious purpose, but to "provid[e] accurate historical insight into the various means by which people tried to cope with the devastation of the September 11 attacks"). Rather, it is a case in which the Commission and its religiously affiliated amici ask the judiciary to strip a long-recognized, "pre-eminent symbol" of a religion of its predominantly sectarian meaning. *See, e.g.*, *Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1122–23 (10th Cir. 2010) (concluding Latin crosses that state erected to commemorate deaths of law enforcement officers, otherwise devoid of context, retained predominantly religious meaning, notwithstanding state's claim that cross had "become a secular symbol of death").

Otherwise put, to accept the Commission's assertion that the Latin cross erected at the Bladensburg intersection does not convey a predominantly sectarian message would prohibit the ability of those who raised the symbol to prominence to continue to safeguard and define its primary meaning. Indeed, sanctioning a governmental body's

8

attempt to imbue a traditionally religious symbol, like the Latin cross, with secular meaning poses the risk that "religion may be compromised as political figures reshape the religion's beliefs [or symbols] for their own purposes." *Lee v. Weisman*, 505 U.S. 577, 608 (1992) (Blackmun, J., concurring). And permitting government to serve as the arbiter of religious belief and meaning would "weaken in those who profess this Religion a pious confidence in its innate excellence, and the patronage of its Author; and to foster in those who still reject it, a suspicion that its friends are too conscious of its fallacies, to trust it to its own merits." *See Remonstrance* ¶ 6.

If the Latin cross here at issue is more overtly secular than sectarian, as the Commission and amici maintain, then their concern that altering or removing the monument would be "hostile" to religious beliefs is puzzling. If, on the other hand, the Commission and its amici's concern that removing the Bladensburg Cross would amount to judicial hostility towards religion stems from the fact that the Latin cross continues to stand in their minds as a potent religious symbol, then permitting the cross to stand on governmental property would diminish the power of that symbol, as such a resolution entails a judicial finding that the cross is *not* a predominantly religious symbol. Perhaps De Tocqueville put it best in his 1840 reflections upon democracy in the United States, in which his travels through our country revealed that "the spirit of religion and the spirit of freedom . . . were intimately united":

> [W]hen a religion contracts an alliance [with government], . . . it commits the same error as a man who should sacrifice his future to his present welfare; and in obtaining a power to which it has no claim, it risks that authority which is rightfully its own. When a religion founds its empire upon the desire of immortality which lives in every human heart, it may

9

aspire to universal dominion; but when it connects itself with a government, it must necessarily adopt maxims which are only applicable to certain nations. Thus, in forming an alliance with a political power, religion augments its authority over a few, and forfeits the hope of reigning over all.

As long as a religion rests upon those sentiments which are the consolation of all affliction, it may attract the affections of mankind. But if it be mixed up with the bitter passions of the world, it may be constrained to defend allies whom its interests, and not the principle of love, have given to it.

Alexis de Tocqueville, *Democracy in America* vol. I, ch. XVII, pt. III (Henry Reeve ed. 2006).

We should be wary of allowing the government—however innocuous such an allowance may initially seem—to define the principal meaning of a symbol that otherwise would be defined by those individuals to whom it brings meaning. "In America, religion . . . restricts itself to its own resources, but of those none can deprive it: its circle is limited to certain principles, but those principles are entirely its own, and under its undisputed control." *Id.* As long as that control endures, "religion is sustained by those feelings, propensities, and passions which are found to occur under the same forms, at all the different periods of history, [and therefore] may defy the efforts of time; or at least . . . can only be destroyed by another religion. But when religion clings to the interests of the world, it becomes almost as fragile a thing as the powers of earth." *Id.*

Sentiments aside, the majority opinion is a faithful application of the law.

10

GREGORY, Chief Judge, dissenting from the denial of rehearing en banc, in which Judge Wilkinson and Judge Agee join:

I would grant rehearing en banc for the reasons expressed in my dissent to the panel decision. *See Am. Humanist Ass'n v. Maryland–National Capital Park & Planning Comm'n*, 874 F.3d 195, 215–22 (4th Cir. 2017) (Gregory, C.J., concurring in part and dissenting in part). I do not write to discuss further my legal analysis and reasoning. Instead, I join Judge Wilkinson's eloquent dissent from the denial of rehearing en banc and give these few thoughts.

Unlike the sprawling acres of Arlington National Cemetery, Veterans Memorial Park has a single monument on a tiny plot of land that honors local soldiers who died defending their country in World War I. But like the lives of the fallen heroes it honors, what the Park lacks in length it makes up in height. Nearly a century ago, Maryland citizens, out of deep respect and gratitude, took on the daunting task of erecting a monument to mirror the measure of individual devotion and sacrifice these heroes had so nobly advanced. The panel majority says their effort violates the Constitution the soldiers fought to defend. I, respectfully, think otherwise. But wherever one's views fall on this matter, I am certain that it raises an important question worthy of the full Court's review.

WILKINSON, Circuit Judge, with whom Chief Judge GREGORY and Judge AGEE, join, dissenting from the denial of rehearing en banc:

I would grant rehearing en banc for the reasons expressed in Chief Judge Gregory's dissent to the panel decision. *See Am. Humanist Ass'n v. Maryland–National Capital Park & Planning Comm'n*, 874 F.3d 195, 215–222 (4th Cir. 2017) (Gregory, C.J., concurring in part and dissenting in part). I add only these few thoughts.

Forty-nine names appear on the plaque at the base of the Great War memorial in Prince George's County. Aggregate figures do not do justice to individual soldiers. Each name marks the tragedy of a life lost before its time. Each death marks a worthy sacrifice.

We honor those Americans who died serving their country in different ways. Families respect their fallen sons and daughters in pictures, prayers, and memory. Their country honors them in ceremony, as at Memorial Day, but more often with quietude.

The dead cannot speak for themselves. But may the living hear their silence. We should take care not to traverse too casually the line that separates us from our ancestors and that will soon enough separate us from our descendants. The present has many good ways of imprinting its values and sensibilities upon society. But to roil needlessly the dead with the controversies of the living does not pay their deeds or their time respect.

This memorial and this cross have stood for almost one full century. Life and change flow by the small park in the form of impatient cars and trucks. That is disturbance enough. Veterans Memorial Park may not be Arlington National Cemetery, but it is the next thing to it. I would let the cross remain and let those honored rest in peace.

12

NIEMEYER, Circuit Judge, dissenting from the denial of rehearing en banc:

Although the Establishment Clause allows monuments that include religious symbols or texts to stand on public lands, *see Van Orden v. Perry*, 545 U.S. 677 (2005), the majority rules that an almost 100-year old monument commemorating soldiers from Prince George's County who died in World War I must be removed because it is shaped in a large Celtic cross. The holding not only violates *Van Orden*, it also needlessly puts at risk hundreds of monuments with similar symbols standing on public grounds across the country, such as those in nearby Arlington National Cemetery, where crosses of comparable size stand in commemoration of fallen soldiers. Because this ruling has such far-reaching and unnecessary consequences, it should be reheard by our court en banc, and I dissent from the vote not to do so.

The mothers of soldiers who died during World War I and other private citizens in Prince George's County, Maryland, erected a memorial almost 100 years ago commemorating the soldiers' service to the Nation. The memorial, which consists of a large concrete Celtic cross on a pedestal, includes on four sides the words "Valor," "Endurance," "Courage," and "Devotion" and a plaque stating: "This Memorial Cross Dedicated to the Heroes of Prince George's County, Maryland Who Lost Their Lives in the Great War for the Liberty of the World." The plaque also includes the names of the 49 men who are commemorated by the monument and a quote from President Wilson, stating, "The right is more precious than peace. We shall fight for the things we have always carried nearest our hearts. To such a task we dedicate our lives." The monument's use of

13

the cross shape mirrors the custom in Europe during World War I where "the Cross became the principal grave marker" in cemeteries where soldiers were buried.

The monument at issue in this case stands in Veterans Memorial Park and is surrounded by numerous other monuments commemorating those who died in the Nation's conflicts, including a World War II Honor Scroll, a Pearl Harbor Memorial, a Korea-Vietnam Veterans Memorial, a September 11 Memorial Garden, a large Battle of Bladensburg Memorial, and two 38-foot-tall statutes of soldiers, one British and one American, facing each other across a bridge. Some of these monuments are as tall as the monument at issue in this case. Moreover, within 40 miles of the monument are other similar monuments commemorating lost soldiers and incorporating Christian symbols, such as the Wayside Cross in Towson, Maryland, the Victory Cross in Baltimore, and the Argonne Cross and the Canadian Cross of Sacrifice in Arlington National Cemetery.

In 1961, the property on which the monument was erected was deeded to the Maryland-National Capital Park and Planning Commission because it had become a highway safety issue due to the monument's location in the median of the busy intersection of U.S. Route 1 and Maryland Route 450. It is now maintained by the Commission. Since 1961, however, the monument has continued to be used during relevant holidays to commemorate those who died in war.

Until this action was filed by persons who claim to be offended by the presence of the monument, no complaint had been made about its presence or its use of a Christian symbol.

The panel, in a 2-1 decision, will now have the monument removed or destroyed because, as it concludes, its presence on public land amounts to a violation of the Establishment Clause, although no Supreme Court case has ever held that the Establishment Clause prohibits such monuments. Indeed, it has held to the contrary — that "the Establishment Clause of the First Amendment *allows* the display" of monuments like the one here. *Van Orden*, 545 U.S. at 681 (emphasis added) (plurality opinion) (holding that the Establishment Clause allows a large granite monument inscribed with the Ten Commandments to stand on the grounds of the Texas State Capitol); *id*. at 700–01, 703–04 (Breyer, J., concurring in the judgment). The panel opinion seeks to distinguish *Van Orden* on the ground that the cross as a symbol "differs from other religious monuments, such as the Ten Commandments" because the Ten Commandments is "well known as being tied to our Nation's history and government" and because, unlike the monument at issue in *Van Orden*, the monument here is "conspicuously displayed at a busy intersection." The panel further rationalizes that when crosses are ordinarily used to commemorate fallen soldiers, such as in Arlington National Cemetery, they "are much smaller than the 40-foot tall monolith at issue here." The opinion, however, fails to recognize that there are similarly sized monuments incorporating crosses in the Arlington National Cemetery — indeed, also elsewhere nearby. The panel opinion directs the district court, which had held that the Establishment Clause was not violated by the monument, to consider on remand whether the arms of the cross should be "remov[ed]" or the cross entirely "raz[ed]," or other "arrangements [could be made] that would not offend the Constitution."

15

The Supreme Court has adopted numerous tests for deciding Establishment Clause cases, and it debated in *Van Orden* which might apply in assessing monuments on public lands that contain religious symbols. 545 U.S. 683–88 (plurality opinion) (canvassing the various tests that have been applied in varying circumstances); *id.* at 698 (Breyer, J., concurring in the judgment) (noting that there is "no simple and clear measure which by precise application can readily and invariably demark the permissible from the impermissible") (internal quotation marks and citation omitted). Ultimately, the Court, in determining whether "passive monuments" on public grounds that include religious symbols violate the Establishment Clause, justified its decision "both by the nature of the monument and by our Nation's history." *Id.* at 686 (plurality opinion); *see also id.* at 703–04 (Breyer, J., concurring in the judgment) ("I rely less upon a literal application of any particular test than upon consideration of the basic purposes of the First Amendment's Religion Clauses themselves"). Specifically, the Court held that "a large granite monument bearing the text of the Ten Commandments located on the grounds of the Texas State Capitol" was allowed by the Establishment Clause, despite the Court's recognition that the Ten Commandments' text "has a religious message." 545 U.S. at 700 (Breyer, J., concurring in the judgment); *see also id.* at 690 (plurality opinion). The Court's conclusion was based on the following observations that it made about the monument at issue there: (1) that the text on the monument conveyed both a "religious message" and a "secular moral message"; (2) that the monument has stood in a secular setting on Capitol grounds for some 40 years; (3) that the monument was donated by a private, "primarily secular" organization to highlight the Ten Commandments' role in "shaping civil morality"; (4) that

16

the monument's physical setting "suggest[ed] little or nothing of the sacred," as it sat "in a large park containing 17 monuments and 21 historical markers"; and (5) that over a period of 40 years, the monument "went unchallenged" until the present case. *Id*. at 701–02 (Breyer, J., concurring in the judgment); *see also id*. at 681, 688–92 (plurality opinion).

It strains established judicial analysis to conclude that *Van Orden* does not allow the monument in this case to stand as a secular memorial to the lives of soldiers lost during war in service of the Nation. The panel decision not only wrongly distinguishes *Van Orden*, but, in doing so, also offends the monument's commemoration of those soldiers' sacrifice. Moreover, it puts at risk hundreds, and perhaps thousands, of similar monuments. The Establishment Clause was never intended to be so interpreted, and the Supreme Court has never so interpreted it.

Our vote not to rehear this case en banc is an unfortunate misstep.